Ryan G. Weldon
**LAIRD COWLEY, PLLC**
2315 McDonald Avenue, Suite 220
Missoula, MT 59801
P.O. Box 4066
Missoula, MT 59806-4066
Telephone:  (406) 541-7400
Facsimile:  (406) 541-7414
Email:        rweldon@lairdcowley.com

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

*Attorneys for Plaintiff KalshiEX LLC*

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Matthew J. Laroche (*pro hac vice* forthcoming)
Kelly D. Garcia (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| KALSHIEX LLC,<br><br>        Plaintiff,<br><br>    vs.<br><br>AUSTIN KNUDSEN, in his official capacity as Attorney General of Montana; ALEX STERHAN, in his official capacity as Administrator of the Montana | Case No. <u>CV-26-28-H-JTJ</u><br><br>COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF |

Gambling Control Division; MONTANA GAMBLING CONTROL DIVISION; TONY HARBAUGH, in his official capacity as Member of the Montana Lottery and Sports Wagering Commission; JON METROPOULOS, in his official capacity as Member of the Montana Lottery and Sports Wagering Commission; STEVE MORRIS, in his official capacity as Member of the Montana Lottery and Sports Wagering Commission; LEO PRIGGE, in his official capacity as Member of the Montana Lottery and Sports Wagering Commission; and JANNA TAYLOR, in her official capacity as Member of the Montana Lottery and Sports Wagering Commission,

Defendants.

## INTRODUCTION

1.      This action challenges the State of Montana's intrusion into the federal government's exclusive authority to regulate derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC").  7 U.S.C. § 2(a)(1)(A).  Plaintiff KalshiEX LLC ("Kalshi" or "Plaintiff") believes Montana will imminently bring an enforcement action against Kalshi with the intent to prevent Kalshi from offering event contracts for trading on its federally regulated exchange.

2.      Kalshi is a federally designated derivatives exchange, subject to the CFTC's exclusive jurisdiction.  It offers consumers the chance to trade in many types of event contracts.  These contracts are subject to exclusive federal oversight, and—

2

critically—they are *lawful* under federal law, and state gambling laws that seek to regulate them are preempted.  Indeed, in the last week the Third Circuit found as much, and a district court within this circuit used the same reasoning in issuing a temporary restraining order barring Arizona officials from enforcing state gambling laws against exchanges like Kalshi.  *See, e.g., KalshiEX LLC v. Flaherty*, --- F.4th ----, 2026 WL 924004 (3d Cir. Apr. 6, 2026); Order, *KalshiEX LLC v. Johnson*, Case No. 2:26-cv-01715-MTL, ECF No. 65 (D. Ariz. Apr. 10, 2026).

3.      But Montana has taken a different view, and its intent to bring an enforcement action against Kalshi is clear.  Over a year ago, on March 26, 2025, the Montana Department of Justice's Gambling Control Division (the "GCD") issued a cease-and-desist letter (the "March 2025 C&D") asserting that Kalshi's "event contracts" constitute illegal gambling under Montana law and directing Kalshi to cease offering such contracts to persons located within the State.  March 2025 C&D, Ex. 1.

4.      On April 11, 2025, Kalshi's outside counsel met with representatives of the GCD and reached a non-enforcement agreement.  GCD-Kalshi Email Chain, Ex. 2 at 2-3.  The GCD agreed that it would "not initiate any civil or criminal enforcement against Kalshi during the pendency of" an ongoing litigation between Kalshi and Nevada officials, in which Kalshi had obtained a preliminary injunction.  *Id*. (citing *KalshiEX LLC v. Hendrick, et al.*, No. 2:25-cv-00575-APG (D. Nev.)).

The GCD further agreed that Montana "intend[ed] to defer any enforcement pending the outcome of the proceedings before Chief Judge Gordon in Nevada and any appeal to the Ninth Circuit," and that "when those proceedings conclude, Montana authorities will provide Kalshi with reasonable notice before attempting to commence any civil or criminal enforcement action." *Id*. at 3. On April 16, 2025, Montana authorities confirmed their "concur[rence]" with this understanding in writing. *Id.* at 2. That agreement remained undisturbed for nearly a year.

5. The proceedings in Nevada are still ongoing, and the Ninth Circuit is scheduled to hear argument in that case this week. Despite that, on April 6, 2026, the GCD mailed another cease-and-desist letter (the "April 2026 C&D") to Kalshi. The April 2026 C&D mischaracterized the clear terms of the parties' prior agreement, and said that the GCD had "conducted an investigation into [Kalshi's] activities in" Montana and concluded that they "constitute illegal gambling within the meaning of Montana law." April 2026 C&D, Ex. 3 at 1. It concluded by threatening that unless Kalshi ceased its (lawful and federally regulated) operation in Montana, the result would be "legal action against" Kalshi. *Id.* at 3.

6. As such, Kalshi faces an immediate threat that Defendants will attempt to enforce Montana's preempted state laws against it.

7. Montana's stated intent to prohibit Kalshi from operating intrudes upon the federal regulatory framework that Congress established for regulating the trading

of derivatives on federally designated exchanges.  The state's efforts to regulate Kalshi are preempted under principles of express preemption, field preemption, and conflict preemption.  This Court should therefore issue both a preliminary and a permanent injunction, as well as grant declaratory relief.

8.    Commodity futures regulation has long been under the exclusive purview of the federal government.  In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives.  In 1974, Congress established a federal agency called the CFTC to oversee it.

9.    The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of derivatives on exchanges overseen by the CFTC, known as "designated contract markets" or "DCMs."  The text of the statute gives the CFTC "exclusive jurisdiction" over trading on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  During the drafting of the 1974 amendments to the CEA, Congress deleted a provision that would have granted states concurrent jurisdiction over futures trading.  *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).  One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 50 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on*

*Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). As the conference report to the 1974 amendments explained, they were designed to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject certain categories of event contracts as against the public interest.

10.     For that reason, courts have easily found that the CEA preempts state laws in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563–64 (6th Cir. 1998). The CFTC itself agrees. It informed the U.S. Court of Appeals for the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583 (emphasis added).[1]

---

[1] Commentators have likewise concluded with no difficulty that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vand. L. Rev. 1, 2 (1976). And commentators have specifically recognized that "the CEA preempts state bucket-shop laws and other anti-gambling

11.    In *Flaherty*, the U.S. Court of Appeals for the Third Circuit affirmed the District of New Jersey's grant of a preliminary injunction to prevent similar state overreach.    In ruling for Kalshi, the Third Circuit emphasized that because "Congress gave the CFTC exclusive jurisdiction over trades on DCMs, [and] provided for continued state regulation of trades conducted off DCMs," it was "reasonable for the District Court to conclude that Kalshi was likely to succeed in showing that the [CEA] preempts [state] law" from "reaching into Kalshi's CFTC-licensed DCM[.]"  *Flaherty*, 2026 WL 924004, at *6.  *But see KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025)*, appeal pending*, Case No. 25-1892 (4th Cir.); *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282 (D. Nev. Nov. 24, 2025), *appeal pending*, Case No. 25-7516 (9th Cir.); *KalshiEX LLC v. Schuler*, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026), *appeal pending*, Case No. 26-03196 (6th Cir.).

12.    The Third Circuit also found that Kalshi faced irreparable harm because "absent injunctive relief, Kalshi would suffer economic and reputational harm, including loss of business and goodwill." *Flaherty*, 2026 WL 924004, at *6; *see also KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *7 (D.N.J. Apr. 28, 2025) (describing the circumstances as a "Hobson's choice" for Kalshi where "leaving it

---

legislation." Kevin T. Van Wart, Preemption and the Commodity Exchange Act, 58 Chi.-Kent L. Rev. 657, 721 (1982).

subject to state enforcement or obligating it to shift its business practices [are] consequences that are not cleanly undone").

13.     The CFTC has consistently affirmed its exclusive role in regulating derivatives markets like Kalshi, and the CFTC has committed to defending that authority against improper attacks from state regulators.  Amicus Brief of CFTC at 1, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2, at 1 ("CFTC Amicus Br.") ("Congress vested the CFTC with exclusive jurisdiction to protect that national interest by overseeing the regulation of futures, options, and swaps traded on federally regulated exchanges…[t]he *CFTC's jurisdiction supersedes State as well as Federal agencies* because commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, surveillance, and enforcement of financial instruments traded in these markets to prevent the type of fragmented oversight" that would result from state enforcement) (citation modified) (emphasis added).  Recently, the CFTC and the Department of Justice initiated litigation against three states—Arizona, Connecticut, and Illinois—to prevent them from applying state gambling laws to event contracts traded on CFTC-regulated DCMs (as Defendants seek to do here), leaving no doubt as to the CFTC's view that the trading of Kalshi's event contracts is subject to its exclusive jurisdiction.  *See generally United States v. Arizona*, 2:26-cv-02246, Dkt. 1 (D. Ariz. Apr. 2, 2026) ("Ariz. Compl."); *United States v.*

*Connecticut*, 3:26-cv-00498, Dkt. 1 ("Conn. Compl."); *United States v. Illinois*, 1:26-cv-03659, Dkt. 1 (N.D. Ill. Apr. 2, 2026) ("Ill. Compl.").

14.    Indeed, just days ago, a federal court in the District of Arizona granted the CFTC's motion for a Temporary Restraining Order barring Arizona state gaming regulators from enforcing laws materially similar to those that Montana seeks to enforce against Kalshi here.  Order, *KalshiEX LLC v. Johnson*, Case No. 2:26-cv-01715-MTL, ECF No. 65 (D. Ariz. Apr. 10, 2026).  In doing so, the court "agree[d] with and adopt[ed] the view that 'if event contracts are swaps under the [CEA], . . . the scope of field preemption [is] the regulation of trading on a DCM.'"  *Id.* at 3 (citing *Flaherty*, 2026 WL 924004, at *4).

15.    The rulings in *Flaherty* and *Johnson* reflect a growing recognition by federal courts that Kalshi's contracts are legal under federal law, subject to the exclusive jurisdiction of the CFTC.  In February, a federal court in the Middle District of Tennessee granted Kalshi a preliminary injunction barring officials in that state from taking action against Kalshi's exchange, based on a finding that Kalshi's contracts—specifically Kalshi's sports event contracts—are swaps subject to the CFTC's exclusive jurisdiction.  *KalshiEX v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("The court finds that Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies.").

16.    The Tennessee court was also persuaded that Kalshi would suffer irreparable harm because its constitutional rights were threatened and because "[a]bsent an injunction, Kalshi could either continue its operations in Tennessee and face potential civil and criminal liability" or attempt to comply and risk its position as a national exchange.  *Id.* at \*10.  The court further noted that Kalshi would be irreparably injured from the "substantial expenses and reputational harm" it would incur from attempting to comply with Tennessee's unconstitutional demands.  *Id.* at \*11.

17.    An enforcement action by Montana designed to prohibit Kalshi from offering contracts that federal law permits would intrude on the comprehensive federal scheme for regulating designated exchanges.  Kalshi is a federally designated and approved derivatives exchange, subject to the CFTC's exclusive jurisdiction. Kalshi offers consumers the chance to trade many types of event contracts, all of which are subject to extensive oversight by the CFTC, and are *lawful* under federal law.  The CFTC has the authority to initiate the review of, and under certain circumstances, prohibit the trading of, contracts listed on Kalshi's federally regulated exchange.  As discussed, the CFTC has made clear that it views Kalshi's offerings as legal and within its purview.

18.    Even though Kalshi's contracts are subject to the CFTC's exclusive jurisdiction, Defendants have made clear that they (mistakenly) believe that Kalshi's

contracts are instead subject to—and unlawful under—Montana law.  The GCD argued that Montana law "prohibits all forms of public gambling in Montana unless specifically authorized by statute[,]" defining "gambling" as "risking any money, credit, deposit, check, property, or other thing of value for a gain that is contingent in whole or in part upon lot, chance, or the operation of a gambling device or gambling enterprise."  Ex. 3 at 1 (quoting Montana Code Annotated ("MCA") §§ 23-5-157, 23-5-112(14)(a)).  Accordingly, the GCD characterizes *all* of Kalshi's event contracts as "gambling within the meaning of MCA § 23-5-112(14)(a)."  *Id.* at 2.

19.     The GCD noted that "[i]nternet gambling[,]" defined as "gambling through the use of communications technology that allows a person using money to transmit to a computer information to assist in the placing of a bet and corresponding information related to the display of a game," is "a type of illegal gambling enterprise by definition."  Ex. 3 at 1-2 (quoting MCA §§ 23-5-112(16), (22)(d), (23)(a)).  The GCD added that it can seek a "permanent injunction on illegal gambling activity through an administrative proceeding or the courts" or "refer illegal gambling activity for prosecution."  *Id.* at 2 (quoting MCA §§ 23-5-113, 23-5-136).  The clear implication is that Kalshi may face ***criminal prosecution*** in Montana for offering its event contracts, which are lawful under federal law.  MCA §§ 23-5-161 (misdemeanor offenses); 23-5-162 (felony offenses).

20. The GCD further stated it "has probable cause to conclude" that Kalshi's event contract offerings in Montana "constitute[] illegal gambling and illegal sports wagering pursuant to Montana law." Ex. 3 at 2.

21. The GCD demanded that Kalshi halt its offering of event contracts in Montana and stated it "expect[ed]" Kalshi to "voluntarily comply" with its order, and that "[r]efusal to do so will result in legal action against Kalshi[.]" *Id.* at 3.

22. Defendants' statements leave little doubt that Defendants intend to bring an enforcement action against Kalshi unless Kalshi stops offering contracts entirely—which, again, are offered for trade on its federally regulated exchange without objection from the CFTC—in Montana. In doing so, Defendants seek to subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and Defendants would interfere with the CFTC's exclusive authority to regulate derivatives trading on the exchanges it oversees.

23. Kalshi received the April 2026 C&D by mail on Saturday, April 11, 2026. Shortly thereafter, counsel for Kalshi reached out to Attorney General Knudsen, expressing confusion over the receipt of the April 2026 C&D in light of Kalshi's written agreement to preserve the status quo during the pendency of the *Hendrick* appeal before the Ninth Circuit, and asking to speak with the Attorney General or a member of his team over the weekend. Although the Attorney General responded to confirm he would look into the issue, he did not respond further. On

April 12, 2026, concerned by the Attorney General's lack of further response, counsel for Kalshi contacted representatives of the GCD and Attorney General's office that it met with in April 2025 (including the author of the April 2026 C&D). Ex. 2 at 1-2. Kalshi explained that it understood the letter "to be a statement that the GCD views our prior agreement as no longer in effect" and requested that it receive a response by 8 p.m. that evening if that was not correct. *Id.* The email made clear that Kalshi understood the April 2026 C&D as a threat of legal action, and Kalshi's counsel offered to make themselves available at any time for a discussion. *Id.* Kalshi's counsel also attempted to contact each of the officials it met with in April 2025 by telephone, but was unsuccessful. Kalshi has not received a response to its outreach as of this filing.

24.     Defendants' threatened actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has expressly and impliedly occupied the field of regulating trading on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal law. Kalshi is entitled to declaratory and injunctive relief to prevent Montana authorities from enforcing their preempted state laws against Kalshi.

25.     Accordingly, Defendants' threatened actions would result in irreparable harm, not just to Kalshi, but to its customers and commercial counterparties. Shutting down Kalshi's ability to offer event contracts in Montana would threaten

Kalshi's viability and require devising complex technological solutions.  It would also impair Kalshi's existing contracts with consumers and business partners, subject Kalshi's users to uncertainty and loss, undermine confidence in the integrity of Kalshi's platform, threaten its prospective business relationships, and jeopardize Kalshi's status as a CFTC-approved exchange.  For that reason, Kalshi intends to imminently seek an emergency temporary restraining order and preliminary injunction to avoid the immediate and irreparable harm that would result from Defendants' unlawful acts.

## JURISDICTION AND VENUE

26.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution.  The federal question presented is whether Montana gambling laws are preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

27.    The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. The "Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities." *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

28.    Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). Defendants perform their duties in and thus reside in this District.  A substantial part

14

of the events giving rise to the claim occurred in this District. *See also* Mont. Dist. L.R. 1.2(a)(2), (c)(4).

## PARTIES

29.    Plaintiff Kalshi is a financial services company with its principal place of business in New York.  Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

30.    Defendant Austin Knudsen is sued in his official capacity as Attorney General of Montana.  The Attorney General oversees the Montana Department of Justice, which includes the GCD.

31.    Defendant Alex Sterhan is sued in his official capacity as the Administrator of the Montana Gambling Control Division.

32.    Defendant Montana Gambling Control Division is sued as the state agency that regulates legal gambling in the state of Montana by conducting licensing, permitting, collecting, auditing, testing, programming, inspecting, investigating, prosecuting, and reporting activities with respect to covered entities. The GCD regulates all forms of gambling in Montana except for sports betting, the Montana Lottery, and horse racing.

33.    Defendants Tony Harbaugh, Jon Metropoulos, Steve Morris, Leo Prigge, and Janna Taylor are sued in their official capacities as members of the Montana Lottery and Sports Wagering Commission.  The Montana Lottery and Sports Wagering Commission oversees the operations of the Montana Lottery, including the Sports Bet Montana sportsbook.  Together, Defendants would be responsible for enforcing any demand for Kalshi to comply with Montana state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

**A.    An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.**

34.    Derivatives contracts are financial tools used to mitigate risk.  Event contracts are a quintessential example of a derivatives contract—they are a type of option.  This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question:  Every "yes" position has an equal and opposite "no" position.  For example, a derivatives contract might center around whether a magnitude 8 earthquake will take place in California before January 1, 2027.  A purchaser may trade on either the "yes" or the "no" position on the contract.  If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

16

35.    Event contracts are traded on an exchange.  Traders exchange positions with other traders in the marketplace.  Importantly, event contracts do not reflect a "bet" against the "house."  Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").  Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

36.    The value of an event contract is determined by market forces.  An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence.  During that period, individuals can buy and sell the contract at its fluctuating prices.  The ultimate value of an event contract is determined at its expiration date.  If the underlying event occurs, the holder of the "yes" position is entitled to its full value.  But if the underlying event does not occur, the holder of the "no" position gets the payment.

37.    Traders price event contracts by reference to available information at any given time.  If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase.

17

The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur.  Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year.  The 30% figure can be informed by data points the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

38.    Event contracts are a valuable means to hedge against event-driven volatility.  Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market.  There is no other widely available financial instrument with this unique capability to capture the risks of an event with potential economic consequences, which is a benefit not only to those that wish to hedge risk or seek return, but also to market observers and other economic actors.

39.    To give just some of many examples, this past February, researchers at the Federal Reserve published a paper for which the "results suggest that Kalshi markets provide a high-frequency, continuously updated, distributionally rich

benchmark that is valuable to both researchers and policymakers."[2]  Findings in that paper included that "Kalshi markets are well-behaved and broadly consistent with those from more established financial instruments," and that "in several episodes, they allocate probability mass in ways that may reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."[3]  Further, Kalshi's "median and mode have a perfect forecast record on the day before the [Fed Open Market Committee] meeting, which represents a statistically significant improvement over the fed funds futures forecast,"[4] and, for headline consumer price index forecasts, "Kalshi provides a statistically significant improvement over the Bloomberg consensus forecast."[5] And, "Kalshi provides real-time, distributional forecasts for macroeconomic variables such as GDP, core CPI, and unemployment—markets for which options

---

[2] Anthony M. Diercks, Jared Dean Katz & Jonathan H. Wright, *Kalshi and the Rise of Macro Markets*, Finance and Economics Discussion Series Paper 2026-010, Board of Governors of the Federal Reserve System, at 1 (Feb. 18, 2026), https://www.federalreserve.gov/econres/feds/kalshi-and-the-rise-of-macro-markets.htm.

[3] *Id.* at 2-3.

[4] *Id.* at 3.

[5] *Id.*

data have historically been unavailable."[6]

40.     As another example, Kalshi recently announced a partnership with Tradeweb, a leading global operator of electronic marketplaces for rates, credit, equities, and money markets, which facilitates more than $2.6 trillion in notional value of instruments traded per day.[7]   The partnership is designed to expand institutional access to data from Kalshi's market and to facilitate trading by those same institutional investors on Kalshi's platform.[8]

41.     And late last year, the real estate investment firm Arrived announced its plans to utilize Kalshi's event contracts to hedge the risk of a government shutdown impacting its business.[9]

---

[6] *Id.*

[7] Tradeweb and Kalshi Announce Strategic Partnership to Expand Institutional Access to Prediction Markets, Tradeweb (Feb. 19, 2026), https://www.tradeweb.com/newsroom/media-center/news-releases/tradeweb-and-kalshi-announce-strategic-partnership-to-expand-institutional-access-to-prediction-markets/.

[8] *See* Katherine Doherty and Sridhar Natarajan, *Wall Street Bond-Trading Hub Tradeweb Strikes Deal with Kalshi*, Bloomberg (Feb. 19, 2026), https://www.bloomberg.com/news/articles/2026-02-19/bond-trading-hub-tradeweb-strikes-prediction-markets-deal-with-kalshi.

[9] *See* Ryan Frazier, LINKEDIN, https://www.linkedin.com/posts/activity-7386091007588749312-rhxN/ [https://perma.cc/CQN6-JK3M]; *see also* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises $1 Billion in a New Round*, N.Y. TIMES (Dec. 2, 2025),

42.    Though Defendants have attacked prediction markets broadly, some states have focused in particular on Kalshi's sports event contracts.  But these too are swaps that fall under the CFTC's exclusive jurisdiction.  That is because, as both courts and the CFTC have recognized, sporting events can have significant economic consequences for a broad ecosystem of stakeholders.  *Orgel*, 2026 WL 474869, at *7–10; *Flaherty*, 2025 WL 1218313, at *6; CFTC Amicus Br. at 19-20.  Advertisers, sponsors, television networks, local communities, sportsbooks, and others all stand to gain or lose substantial sums depending on the outcomes of sports events.  Sports event contracts thus offer these entities opportunities to hedge their exposure.  And that is happening in the market right now.

43.    Take, for example, Game Point Capital, a sports-focused insurance firm that works with college athletic departments, pro teams, and sponsors to insure risk related to performance bonuses, coach salary buyouts, postseason and ticket

---

https://www.nytimes.com/2025/12/02/business/dealbook/kalshi-prediction-market-billion.html [https://perma.cc/VUY8-HCDT].

revenue, and other areas of economic exposure.[10]  Game Point Capital uses Kalshi

to hedge, and it intends to do so for $30 million in risk annually.[11]

44.    Likewise, Underdog Sports, a fantasy sports company, uses Kalshi as a

tool to "hedge against volatility" on its own platform.[12]  And others can as well:

sponsors of a particular team or athlete can use event contracts to hedge against the

risk that the team or athlete underperforms.  Hotel operators can hedge against the

revenue earned from a local team making a playoff run, and TV networks can hedge

against the risk that star players who draw viewers may not play in certain games.

45.    Event contracts are also a valuable means of communicating

information to the public because contract prices reflect prevailing market opinions

and conditions.  Prediction markets thus serve as sensitive information-gathering

---

[10] Game Point Capital, *Services*, https://www.gamepointcapital.com/services; *see also* Paul Steinbach, *UConn Insured Basketball Coach Bonuses and Saved Nearly $3M*, Athletic Bus. (Apr. 23, 2024)*,* https://www.athleticbusiness.com/operations/budgeting/article/15669200/uconn-insured-basketball-coach-bonuses-and-saved-nearly-3m (Game Point Capital wrote insurance contract that saved university nearly $3 million in bonus payments to coaches related to NCAA tournament performance.).

[11] Andrew Ross Sorkin et al., *New Epstein Details Rattle Washington, Hollywood and Beyond*, N.Y. Times (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.html.

[12] *See* Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 20, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/.

tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions.  This is not theoretical.  Kalshi has recently announced partnerships with CNN and CNBC, which make use of its market data in their reporting.[13]

46.    Kalshi has recently launched a platform, Kalshi Research, to share market data with academics and promote research derived from the same.[14]  Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

---

[13] *See* James Faris, *Prediction giant Kalshi strikes a new media partnership with CNBC, days after its CNN deal*, Business Insider (Dec. 4, 2025)*,* https://www.businessinsider.com/kalshi-cnbc-deal-cnn-data-integration-partnership-2025-12; R.T. Watson, *Kalshi inks exclusive CNBC deal as prediction markets surge into mainstream media*, The Block (Dec. 4, 2025)*,* https://www.theblock.co/post/381415/kalshi-exclusive-cnbc-deal-prediction-markets-surge-mainstream-media.

[14] *See Kalshi launches new research arm*, Kalshi News, (Dec. 22, 2025) https://news.kalshi.com/p/kalshi-launches-research-arm-prediction-markets.

**B.    Congress Delegated the Power to Regulate Event Contracts That Are Offered by a Regulated Exchange to the CFTC.**

47.    Futures contracts have long been regulated by the federal government. In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

48.    In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA.  Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves," thus subjecting futures exchanges to "conflicting regulatory demands."  *Am. Agric. Movement*, 977 F.2d at 1156.  One Senator remarked that "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).  As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 76, 82 (1974).  The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading.  *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).

49.    The public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM.  7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a).  An entity must first submit an application to the CFTC detailing

24

how the entity complies with the Core Principles of the CEA.  17 C.F.R. § 38.3(a)(2).  Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation.  17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.    Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA.  17 C.F.R. § 38.3(a)(2).  The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission.  17 C.F.R. § 38.3(a)(1).

50.    Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives traded on the market.  Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).  This exclusive jurisdiction extends to "event" contracts.  *See id.* § 1a(47)(A)(ii), (iv), (vi).

25

51.     Once the CEA designates a board of trade as a DCM, the market is subject to an extensive framework for CFTC oversight.  Part 38 of Title 17, Chapter 1 of the Code of Federal Regulations comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA.  Exchanges must meet detailed requirements to maintain their designations as DCMs.  17 C.F.R. pt. 38.  Among other things, DCMs must abide by recordkeeping requirements that specify the form, manner, and duration of retention.  17 C.F.R. §§ 38.950, 1.31.  DCMs must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC.  17 C.F.R. § 38.450, pt. 16.  Part 38 also imposes specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more.

52.     The CEA allows DCMs to list contracts on its exchange without pre-approval from the CFTC.  To do so, a DCM self-certifies that a given contract complies with the CEA and CFTC regulations by filing a "written certification" with the CFTC at the time of listing.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).  The CFTC may initiate review of any contract under its purview.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).  The CFTC also may require a DCM to submit a "written demonstration" that it is "in compliance" with one or more Core Principles at any time.  17 C.F.R. § 38.5(b).

53.    Alternatively, exchanges have the option of submitting contracts to the CFTC for approval prior to listing.  7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c).  The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA.  7 U.S.C. § 7a-2(c)(5)(B).  Substantially all contracts listed by DCMs for trading are self-certified by the listing DCMs; it is extremely rare for a DCM to seek CFTC approval of individual contracts.

*54.*    The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on DCMs.  The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for DCMs. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings.  If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures, including (1) civil monetary penalties, (2) restitution, (3) disgorgement, (4) suspension, denial, revocation, or restriction of registration and trading privileges, and (5) injunctions or cease-and-desist orders.  *See* CFTC Division of Enforcement, Enforcement Manual (May 20, 2020), https://www.cftc.gov/media/1966, at § 3.3.  If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution.  *Id.*

27

55.    The CFTC regulates derivatives that reference physical commodities like "wheat, cotton, rice, corn, oats."  7 U.S.C. § 1a(9).  The CFTC also regulates derivatives on "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences.  *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9).

56.    In 2010, Congress amended the CEA to add "swaps" to the CFTC's exclusive jurisdiction and to define event contracts as a type of swap.  *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024).  "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities."  7 U.S.C. § 7a-2(c)(5)(C)(i).

57.    The CFTC has also recognized that "event contracts," including contracts on "the outcome of particular entertainment events," "can be designed to exhibit the attributes of either options or futures contracts."  *Concept Release*, 73 Fed. Reg. 25,669, 25,669–70 (May 7, 2008).  An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence—for example, the occurrence or severity of a hurricane.  Where event contracts pay out based on financially significant occurrences, they are "of the

28

character of" futures and options, as understood by derivatives markets. *See id*. § 1a(36) (defining "option").

58. Also, in 2010, Congress amended the CEA to add a "Special Rule" governing event contracts. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

## C. After an Extensive Regulatory Process, the CFTC Registered Kalshi as a Contract Market That Operates Under Federal Law.

59. Kalshi is a CFTC-regulated exchange and prediction market where users can trade on the outcome of real-world events. In 2020, the CFTC designated Kalshi as a contract market, affirming that its platform complied with the CEA. Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

60. Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

61.     Kalshi offers many kinds of event contracts related to an array of substantive areas like economics, finance, climate, technology, health, crypto, popular culture, and sports.  For example, Kalshi's platform currently allows users to trade on the level of US GDP growth in Q1 2026, the closing price of the S&P 500 at the end of 2026, whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030.  Kalshi also offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

62.     Prior to making a contract available for trade on its platform, Kalshi self-certifies to the CFTC, pursuant to section 7a-2(c)(1) of the CEA, that the offering complies with the CEA and CFTC regulations.  Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review.

63.     The CFTC also has the ability to require Kalshi to submit a "Demonstration of Compliance," which is "a written demonstration, containing supporting data, information and documents" that a DCM is required to file upon request from the CFTC to explain how the DCM "is in compliance with one or more core principles as specified in the request."  17 C.F.R. § 38.5(b).  The CFTC did just that with respect to Kalshi's first sports event contracts, and Kalshi responded with

30

lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports event contracts traded on DCMs.

64.    The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed, with no hint that the agency views these contracts as falling outside of its jurisdiction.  Had the CFTC deemed Kalshi's sports event contracts (or any other of its contracts) impermissible, it would have had the responsibility to "object[]" to the contracts.  7 U.S.C. § 7a-2(c)(3)(B)(ii).  But it did not.  Unless and until the CFTC takes action on a self-certified Kalshi contract—and they all have been self-certified—the contracts are authorized under federal law.  7 U.S.C. § 7a-2(c)(5).

## D.    The Montana Gambling Control Division Threatened Kalshi with State Criminal Action With Regard To Its Event Contracts.

65.    On or about March 26, 2025, the Montana Gambling Control Division (the "GCD") sent a cease-and-desist letter to Kalshi, through its registered agent, and to Kalshi's outside counsel.  The GCD informed Kalshi that it had conducted an investigation into Kalshi's activities in Montana, concluding that "those activities constitute illegal gambling within the meaning of Montana law" and demanding that Kalshi "cease and desist its illegal activities within the State of Montana."  Ex. 1 at 1.

31

66.     On April 11, 2025, Kalshi's counsel met with representatives of the GCD and reached an agreement to preserve the status quo.   In an email memorializing the meeting sent the same day, Kalshi's counsel stated their "understanding that the Montana authorities agree to preserve the status quo and not initiate any civil or criminal enforcement against Kalshi during the pendency of the Nevada litigation in which Kalshi obtained a preliminary injunction" earlier that week.  Ex. 2 at 2-3.  Kalshi's counsel further stated their understanding that the GCD "intend[ed] to defer any enforcement pending the outcome of the proceedings before Chief Judge Gordon in Nevada and any appeal to the Ninth Circuit," and that "when those proceedings conclude, Montana authorities will provide Kalshi with reasonable notice before attempting to commence any civil or criminal enforcement action."   *Id*. at 3.   On April 16, 2025, Montana's counsel confirmed their "concur[rence]" with this understanding, adding only that Montana considered the deadline to request an administrative hearing tolled for the duration of the Nevada proceedings and any appeal to the Ninth Circuit.  *Id*. at 1.  That agreement remained undisturbed for nearly a year.

67.     On April 6, 2026, the GCD mailed Kalshi another cease-and-desist letter that mischaracterized the parties' prior agreement, which Kalshi received on April 11, 2026.  Ex. 3.  The letter acknowledged the fact that the GCD and Kalshi previously had a non-enforcement agreement, but inaccurately characterized it as

32

one in which "the GCD would refrain from enforcing Montana law against Kalshi based on a preliminary injunction issued in *Kalshiex, LLC v. Hendrick, et al.,* Case No. 2:25-cv-575-APG-BNW." *Id*. at 1. In fact, the parties' actual agreement was that the GCD would "defer any enforcement pending the outcome of the proceedings before Chief Judge Gordon in Nevada and any appeal to the Ninth Circuit." Ex. 2 at 3.

68. The GCD's mischaracterization of the agreement, and clear threat to initiate legal action against Kalshi, gave rise to serious concerns for Kalshi. Counsel for Kalshi contacted Attorney General Knudsen on April 11, 2026, expressing confusion over the receipt of the April 2026 C&D in light of the written agreement to preserve the status quo during the pendency of the *Hendrick* appeal before the Ninth Circuit, and asking to speak with the Attorney General or a member of his team over the weekend. The Attorney General responded to confirm he would look into the issue, but he did not respond further. On April 12, 2026, concerned by the Attorney General's lack of further response, counsel for Kalshi sent an email to Jeremy Craft, Chief Legal Counsel for the GCD and author of the April 2026 C&D, copying GCD staff and representatives of the Attorney General's Office Kalshi met with in April 2025. Through that email, Kalshi sought clarification of the GCD's position vis-à-vis the April 2025 agreement between Kalshi and the GCD. *Id*. at 1-2. The email made clear that Kalshi understood the April 2026 C&D as a threat of

33

legal action, and Kalshi's counsel offered to make themselves available at any time for a discussion. Kalshi's counsel also attempted to reach the individuals it met with in April 2025 by telephone. Kalshi did not receive a response.

69. Montana state laws contemplate criminal charges for unlawful gambling transactions. Violations of Montana's anti-gambling laws may result in criminal prosecution, permanent injunctions through administrative proceedings or the courts, and other enforcement measures. *See* MCA §§ 23-5-113, 23-5-136, 23-5-161, 23-5-162. The GCD's cease-and-desist letters make abundantly clear that Defendants think Kalshi's event contracts fall within that category.

70. The CFTC has, in an exercise of its exclusive jurisdiction, permitted Kalshi to offer event contracts for trade on its exchange, including its sports-event contracts, which the CFTC views as falling "comfortably within" the CEA and under its own regulatory authority. CFTC Amicus Br. at 19. Nevertheless, Kalshi now understands that Defendants, consistent with the GCD's cease-and-desist letters and subsequent communications, intend to take action against Kalshi.

**E.    Defendants Have Not Provided Assurances of Non-Enforcement.**

71. Kalshi has made good-faith efforts to engage Montana in dialogue. Kalshi's outside counsel spoke with representatives from the GCD on April 11, 2025, and received assurances of non-enforcement. But the April 2026 C&D both threatens Kalshi with legal action and mischaracterizes the parties' prior written non-

34

enforcement agreement. *See* Ex. 3. As such, Kalshi reasonably cannot rely on any future assurance of non-enforcement.

72. Despite previously having a positive working relationship with Kalshi's counsel, the representatives of the GCD have not provided any assurances of non-enforcement after sending the April 2026 C&D. When Kalshi's counsel attempted to contact the Attorney General, members of the Attorney General's office, and the GCD to inquire as to whether Montana was preparing to take action against Kalshi, it was met with silence, even though those individuals had previously been willing to communicate with Kalshi's counsel. The lack of response, combined with the clear threat of an enforcement action in the April 2026 C&D, has led Kalshi to reasonably conclude an enforcement action in Montana is imminent.

73. Kalshi therefore has no option but to seek judicial relief. The GCD's cease-and-desist letters make clear that Defendants believe Kalshi's offering of event contracts in Montana violates Montana law, and that Kalshi may be immediately subjected to action by the State. Absent any assurances of non-enforcement, Kalshi (and its users) face a threat of irreparable harm, leaving Kalshi with no choice but to protect its commercial interests and those of its users and bring this suit.

74. Immediately following the filing of this complaint, Kalshi intends to inform Defendants of its filing, and Kalshi's intent to seek preliminary injunctive

relief. Kalshi will also inform Defendants that, unless Defendants assure Kalshi they will not begin an enforcement proceeding while Kalshi's motion for a preliminary injunction is pending, Kalshi will additionally seek a temporary restraining order barring such an action.[15]

## REQUISITES FOR RELIEF

75.    As a result of Defendants' threatened conduct described above, there is a strong likelihood that Defendants will take action, including, but not limited to, seeking to enforce preempted state law in violation of the Supremacy Clause of the U.S. Constitution, which will subject Kalshi and its customers to irreparable harm.

76.    An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein, including threats to Kalshi, has already resulted in, and will continue to result in, irreparable injury to Kalshi, including but not limited to economic hardship, lost business opportunities, and impairment of existing contractual relationships.

77.    Kalshi has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Kalshi therefore seeks declaratory and injunctive relief

---

[15] Kalshi sought the same relief in Tennessee after the Tennessee attorney general failed to provide any assurance that they would defer enforcement until the court reached a decision on Kalshi's motion for preliminary injunction, and the Tennessee court granted the temporary restraining order. *Orgel*, 2026 WL 474869, at *1–2.

36

restraining Defendants from enforcing Montana law that interferes with the operation and function of Kalshi's DCM described herein.

## COUNT I

### (Supremacy Clause—Preemption by Commodity Exchange Act)

78. Plaintiff incorporates all prior paragraphs by reference.

79. The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

80. The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

81. Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges. 7 U.S.C. § 2(a)(1)(A). Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos." Senate Hearings at 685 (statement of Sen. Clark). Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures

trading on CFTC-regulated exchanges.  *See, e.g.*, *Am. Agric. Movement*, 977 F.2d at 1156; *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

82.     In threatening to enforce MCA §§ 23-5-157, 23-5-112, 23-5-152, 23-5-154, 23-5-113, 23-5-136, 23-7-103, 23-5-161, 23-5-162, and ARM 23.16.3002(1) against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges.  Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter.  Because federal law occupies the entire field of regulating trading on designated contract markets, Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause.

83.     In addition, Defendants' threatened actions conflict with federal law and policy.  Defendants seek to ban event contracts that federal law and the CFTC have authorized (and to subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges.  Congress passed the 1974 Amendments to the

CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement, Inc.*, 977 F.2d at 1156. "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The Seventh Circuit thus explained that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (internal citation omitted). The conflict is even clearer when considering that 49 other states and the District of Columbia might equally attempt to subject Kalshi to their own state laws, producing the patchwork of state-by-state regulation Congress sought to prevent. Moreover, complying with Defendants' implicit demand to immediately cease offering event contracts in Montana or face criminal charges could conflict with the federal law governing DCMs, and would thus imperil Kalshi's CFTC approval. And because federal law requires Kalshi to offer impartial access to its exchange, compliance with Montana law would jeopardize Kalshi's compliance with the federal obligations to which it is subject. For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

84. Additionally, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals

and a state law adopts a different method of enforcement that hampers "the careful balance struck by Congress." *Knox v. Brnovich*, 907 F.3d 1167, 1175 (9th Cir. 2018) (citation omitted). Where Congress reserves "prosecutorial power" and "discretion" over violations for federal authorities, a state regime that allows for state prosecutions of the same actions "conflicts with the federal scheme." *Valle del Sol v. Whiting, Inc.*, 732 F.3d 1006, 1027 (9th Cir. 2013). Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts for trading by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification on the ground that these contracts were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so. The CFTC's Enforcement Division has authority to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, it chose not to do so. Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate. Subjecting federally regulated exchanges to state laws like Montana's would "disrupt 'the congressional calibration of force.'" *Valle del Sol*, 732 F.3d at 1027 (citation omitted).

85.    Furthermore, Defendants' demands conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends. The

40

CFTC's Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services."  17 C.F.R. §§ 38.150, 38.151(b) (emphasis added).  Cutting off Montana residents from Kalshi's platform—including residents with ongoing investments—would be in considerable tension with that principle.  In addition, Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and *market disruptions*."  17 C.F.R. § 38.255 (emphasis added).  Abruptly closing Kalshi's event contracts to anyone located in Montana could constitute exactly the sort of market disruption the CFTC has directed Kalshi to prevent.  Depending on the CFTC's interpretation of its Core Principles, it could well be "impossible for [Kalshi] to comply with both state and federal law"—the paradigmatic case for preemption.  *Valle del Sol*, 732 F.3d at 1023.

86.    Defendants may not enforce Montana's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq.*

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1.     Enter a judgment declaring that MCA §§ 23-5-157, 23-5-112, 23-5-152, 23-5-154, 23-5-113, 23-5-136, 23-5-161, 23-5-162, 23-7-103, ARM 23.16.3002(1), and any other Montana law that is used in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff and its affiliates, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2.     Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing MCA §§ 23-5-157, 23-5-112, 23-5-152, 23-5-154, 23-5-113, 23-5-136, 23-5-161, 23-5-162, 23-7-103, ARM 23.16.3002(1), or any other Montana law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff and its affiliates;

3.     Any other relief within this Court's discretion that it deems just and proper.

DATED: April 12, 2026.

Respectfully submitted,

**LAIRD COWLEY, PLLC**

/s/ Ryan G. Weldon
Ryan G. Weldon

and

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Matthew J. Laroche (*pro hac vice* forthcoming)
Kelly D. Garcia (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*