Ryan G. Weldon
**LAIRD COWLEY, PLLC**
2315 McDonald Avenue, Suite 220
Missoula, MT 59801
P.O. Box 4066
Missoula, MT 59806-4066
Telephone:  (406) 541-7400
Facsimile:  (406) 541-7414
Email:       rweldon@lairdcowley.com

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice*
forthcoming)
William E. Havemann (*pro hac vice*
forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice*
forthcoming)
Andrew L. Porter (*pro hac vice*
forthcoming)
Matthew J. Laroche (*pro hac vice*
forthcoming)
Kelly D. Garcia (*pro hac vice*
forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| KALSHIEX LLC,<br><br>   Plaintiff,<br><br> vs.<br><br>AUSTIN KNUDSEN, in his official capacity as Attorney General of Montana; *et al*.,<br><br>   Defendants. | Case No. 6:26-cv-00028-JTJ<br><br>PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION<br><br>ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

BACKGROUND ..................................................................................................4

    A.    The Exclusive Federal Scheme for Regulating Derivatives on DCMs. ..................................................................................................4

    B.    Kalshi's Federal Registration as a CFTC-Regulated Designated Contract Market..........................................................................8

    C.    The Montana Gambling Regulatory Scheme. ...................................10

    D.    Montana's Cease-and-Desist Letters and Non-Enforcement Agreement. ..........................................................................................11

ARGUMENT .....................................................................................................13

    A.    Kalshi Is Likely to Succeed Because Montana's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations. ...............................................................................14

        1.    Kalshi's Event Contracts Are Swaps Subject to the CEA's Exclusive Jurisdiction. ..................................................15

        2.    Montana's Gambling Laws Are Expressly and Impliedly Field Preempted as Applied to Kalshi's Event Contracts........17

        3.    Montana Laws Are Conflict-Preempted as Applied to Kalshi. ...................................................................................27

    B.    Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction...........................................................................................31

    C.    The Balance of the Equities and Public Interest Favor a Preliminary Injunction..................................................................34

CONCLUSION ..................................................................................................36

## TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
   977 F.2d 1147 (7th Cir. 1992) ...............................................................................9, 27, 28

*Arizona v. United States*,
   567 U.S. 387 (2012)..............................................................................................18, 30, 35

*Baird v. Bonta*,
   81 F.4th 1036 (9th Cir. 2023) ....................................................................................31, 35

*Blue Lake Rancheria v. Kalshi Inc.*,
   No. 25-cv-06162, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ...................................25, 26

*BNSF Ry. Co. v. Hiett*,
   22 F.4th 1190 (10th Cir. 2022) .........................................................................................19

*Botsford v. Blue Cross & Blue Shield of Mont., Inc.*,
   314 F.3d 390 (9th Cir. 2002) .............................................................................................28

*Cal. Pharmacists Ass'n v. Maxwell–Jolly*,
   563 F.3d 847 (9th Cir. 2009) .............................................................................................35

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ..................................................................................31, 33, 34

*CH2O, Inc. v. Meras Eng'g, Inc.*,
   2017 WL 1700844 (C.D. Cal. May 2, 2017) ........................................................................31

*Chamber of Com. of U.S. v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010) ...........................................................................................35

*Commonwealth of Mass. v. KalshiEX LLC*,
   No. 2584-cv-02525 (Mass. Sup. Ct.) .................................................................................32

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000).................................................................................14, 17, 27, 31

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) .......................................................................................14, 34

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982)............................................................................................................14

*Freightliner Corp. v. Myrick*,
   514 U.S. 280 (1995)............................................................................................................19

*FTC v. Ken Roberts Co.*,
    276 F.3d 583 (D.C. Cir. 2001)..................................................................................20

*FTC v. Qualcomm, Inc.*,
    935 F.3d 752 (9th Cir. 2019) ...................................................................................33

*Garrett v. City of Escondido*,
    465 F. Supp. 2d 1043 (S.D. Cal. 2006)....................................................................33

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ...........................................................................31, 34

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)........................................................................................14, 18, 28

*Hughes v. Talen Energy Mktg., LLC*,
    578 U.S. 150 (2016)..................................................................................................18

*Ingersoll-Rand Co. v. McClendon*,
    498 U.S. 133 (1990)..................................................................................................28

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987)..................................................................................................21

*Int'l Trading, Ltd. v. Bell*,
    556 S.W.2d 420 (Ark. 1977)....................................................................................20

*KalshiEX LLC v. CFTC*,
    119 F.4th 58 (D.C. Cir. 2024)....................................................................................2

*KalshiEX LLC v. CFTC*,
    No. 23-3257, 2024 WL 4164694 (D.D.C. Sep. 12, 2024)................................4, 5, 8

*KalshiEX LLC v. CFTC*,
    No. 23-cv-03257, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024)............................22

*KalshiEX LLC v. Flaherty*,
    No. 25-1922, --- F.4th ----, 2026 WL 924004 (3d Cir. Apr. 6, 2026) ............................ *passim*

*KalshiEX LLC v. Flaherty*,
    No. 25-cv-02152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025).....................3, 31, 35

*KalshiEX LLC v. Orgel*,
    No. 3:26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)............................... *passim*

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)..................................................................................................24

iv

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980)................................................................................2, 20

*McGee v. Gerstenberg and Co.*,
    1986 WL 4183 (N.D. Ill. Mar. 25, 1986)..............................................................26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982)..............................................................................................24

*Mississippi v. Louisiana*,
    506 U.S. 73 (1992)................................................................................................18

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)........................................................................................31, 32

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach*,
    738 F.3d 192 (9th Cir. 2013) ................................................................................19

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983)..............................................................................................17

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
    515 F. Supp. 202 (N.D. Ala. 1981).......................................................................25

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    579 U.S. 115 (2016)..............................................................................................19

*Rice v. Bd. of Trade of Chi.*,
    331 U.S. 247 (1947)..............................................................................................21

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ..............................................................................35

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ........................................................................32, 35

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................14, 34

**Statutes**

7 U.S.C. § 1a............................................................................................... *passim*

7 U.S.C. § 2................................................................................................. *passim*

7 U.S.C. § 5..............................................................................................................30

7 U.S.C. § 6..........................................................................................................6, 24

7 U.S.C. § 7 ....................................................................................................6, 24, 29, 30

7 U.S.C. § 7a-2 ................................................................................................ *passim*

7 U.S.C. § 13a-2 ...........................................................................................................25

7 U.S.C. § 16 ................................................................................................................26

31 U.S.C. § 5362 ..........................................................................................................26

MCA § 23-5-112 ...........................................................................................................10

MCA § 23-5-113 ...........................................................................................................10

MCA § 23-5-136 ...........................................................................................................10

MCA § 23-5-157 ...........................................................................................................10

MCA § 23-5-161 ...........................................................................................................10

**Other Authorities**

17 C.F.R. pt. 16 ............................................................................................................24

17 C.F.R. pt. 38 ............................................................................................................24

17 C.F.R. § 1.31 ...........................................................................................................24

17 C.F.R. § 38.3 .............................................................................................................6

17 C.F.R. § 38.5 .............................................................................................................9

17 C.F.R. § 38.100 ........................................................................................................24

17 C.F.R. § 38.151 ...................................................................................................29, 34

17 C.F.R. § 38.255 ........................................................................................................34

17 C.F.R. § 38.450 ........................................................................................................24

17 C.F.R. § 38.950 ........................................................................................................24

17 C.F.R. § 38.1101 ......................................................................................................24

17 C.F.R. § 40.2 .........................................................................................................7, 24

17 C.F.R. § 40.11 ........................................................................................................8, 25

120 Cong. Rec. 30464 (1974) ......................................................................................21

73 Fed. Reg. 25,669 (May 7, 2008) ...................................................................................17

77 Fed. Reg. 48,208 (Aug. 13, 2012)................................................................................17

*Associated*, Oxford English Dictionary (3d ed. 2011) ....................................................15

CFTC Amicus Br., *N. Am. Derivatives Exch., Inc. v. Nevada,* No. 25-7187 (9th
    Cir. Feb. 17, 2026), Dkt. No. 38.2 ..........................................................22, 25, 29, 34

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on
    Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong.,
    2d Sess. (1974)...........................................................................................................5, 20

Fed. R. Civ. P. 65 ...............................................................................................................1

H.R. Rep. No. 93-975 (1974)......................................................................................20, 24

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.).............................................................2, 6, 20

H.R. Rep. No. 97-565, pt. 1 (1982)...................................................................................26

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
    L. Rev. 657 (1982) .........................................................................................................3

Order, *KalshiEX LLC v. Johnson*,
    No. 2:26-cv-01715-MTL (D. Ariz. Apr. 10, 2026), Dkt. No. 65........................3, 23

Philip F. Johnson, The Commodity Futures Trading Commission Act: Preemption
    as Public Policy, 29 Vand. L. Rev. 1 (1976), https://perma.cc/DW9Y-V7G3 ........15

Prediction Markets, 91 Fed. Reg. 6351 n.5 (2026)...........................................................23

Prediction Markets Advisory, CFTC Letter No. 26-08 (Mar. 12, 2026) .........................23

*Review of Commodity Exchange Act and Discussion of Possible Changes:
    Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. (1973)....................5

S. Rep. No. 93-1131 (1974) ..............................................................................5, 6, 19, 21

KalshiEX LLC ("Plaintiff" or "Kalshi") moves the Court under Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction prohibiting Austin Knudsen, in his official capacity as Attorney General of Montana; Alex Sterhan, in his official capacity as Administrator of the Montana Gambling Control Division; the Montana Gambling Control Division ("GCD"), as the state agency that regulates legal gambling in Montana; and Tony Harbaugh, Jon Metropoulos, Steve Morris, Leo Prigge, and Janna Taylor, in their official capacities as members of the Montana Lottery and Sports Wagering Commission (together, "Defendants"); and Defendants' officers, agents, servants, employees, and all persons in active concert or participation with them who received actual notice of the preliminary injunction, from enforcing MCA §§ 23-5-157, 23-5-112, 23-5-152, 23-5-154, 23-5-113, 23-5-136, 23-5-161, 23-5-162, 23-7-103, ARM 23.16.3002(1), or any other Montana law that attempts to regulate Kalshi's exchange.

Defendants are unconstitutionally threatening to prohibit trading on Kalshi's federally designated contract market ("DCM"), even though Kalshi's contracts are federally authorized and Congress preempted state law by granting the CFTC "exclusive jurisdiction" to regulate trading on DCMs. Defendants have indicated their mistaken belief that Kalshi is operating unlawfully in Montana, and Kalshi reasonably believes Defendants are preparing to take imminent action to force Kalshi to cease offering event contracts in the state. These threats to enforce

1

preempted state laws subject Kalshi to irreparable harm and require immediate preliminary relief.

Every marker of congressional intent confirms preemption of state regulation of trading on DCMs like Kalshi. The CEA's text grants the CFTC "exclusive jurisdiction" and thereby "supersede[s]" state law. 7 U.S.C. § 2 (a)(1)(A). Congress sought to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). Courts have held for 50 years that "the CEA preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982). The CFTC recognizes that "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583. Earlier this month, the Third Circuit affirmed a preliminary injunction barring New Jersey officials from enforcing laws similar to those invoked by Montana, finding that because "Congress gave the CFTC exclusive jurisdiction over trades on DCMs, [and] provided for continued state regulation of trades conducted off DCMs," it was "reasonable for the District Court to conclude that Kalshi was likely to succeed in showing that the [CEA] preempts [state] law from reaching into Kalshi's CFTC-licensed DCM." *KalshiEX LLC v. Flaherty*, No. 25-1922, --- F.4th ----, 2026 WL 924004, at *6 (3d Cir. Apr. 6, 2026). Lower courts have likewise granted preliminary injunctions to

2

Kalshi against the sort of state enforcement Defendants threaten here. *See KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies"); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) (holding "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi). Two weeks ago, a federal district court temporarily enjoined Arizona state regulators from proceeding with any criminal or civil actions to enforce their preempted state gaming laws against DCMs. Order, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715-MTL, (D. Ariz. Apr. 10, 2026), ECF No. 65. These decisions adhere to a longstanding consensus that "the CEA preempts state bucket-shop laws and other anti-gambling legislation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 721 (1982).

Kalshi has no option but to seek immediate preliminary relief to avoid imminent irreparable harms. Kalshi entered into a non-enforcement agreement with Montana authorities in April 2025, under which the GCD agreed to "defer any enforcement pending the outcome of the proceedings before Chief Judge Gordon in Nevada and any appeal to the Ninth Circuit." Porter Decl. Ex. 2, at 3. Despite that written agreement—and the ongoing pendency of the Ninth Circuit appeal—the

GCD sent Kalshi another cease-and-desist letter on April 6, 2026, mischaracterizing the prior agreement, stating Montana had conducted an investigation into Kalshi, and threatening "legal action."  Porter Decl. Ex. 3, at 1, 3.  As such, Kalshi has no choice but to seek judicial relief.

Kalshi is likely to prevail on the merits because federal law preempts the application of Montana law against Kalshi.  The balance of harms and public interest likewise favor Kalshi.  Kalshi therefore respectfully requests that this Court issue a preliminary injunction.

**BACKGROUND**

**A.    The Exclusive Federal Scheme for Regulating Derivatives on DCMs.**

Derivative contracts are financial tools that traders use to mitigate risk.  *See KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *1–2 (D.D.C. Sep. 12, 2024).  Event contracts are a type of derivative—they identify a future event with several possible outcomes, a payment schedule, and an expiration date.  *Id.* at *2.  The event contracts at issue here are traded on an exchange, so their prices are determined by market forces.  Kalshi does not set the price of any contract, and unlike a sportsbook there is no "house" that stacks the odds in its favor.  Declaration of Xavier Sottile ("Sottile Decl.") ¶¶ 35–36.  The price of an event contract fluctuates from creation to expiration in accordance with the changing likelihood of the event's occurrence.  *Id.*  During the contract period, individuals can buy and sell the contract

4

at changing prices; users may trade contracts to hedge risk.  Compl. ¶¶ 35-36.  The ultimate value is determined at expiration.  *See KalshiEX*, 2024 WL 4164694, at *2.

Congress passed the CEA in 1936 to regulate derivatives exchanges, but initially chose not to preempt state regulation.  In 1974, Congress amended the CEA to establish the CFTC as the federal agency empowered to oversee and regulate exchanges and to grant the CFTC "exclusive jurisdiction" to regulate trading on the exchanges it oversees.  These amendments were designed to "[b]ring[] all futures trading under federal regulation."  *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong., 2d Sess. 848 (1974) (hereinafter "Senate Hearings").  Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction."  *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. 128 (1973).  Subjecting exchanges to "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).

Congress deliberately reinforced the CFTC's exclusive jurisdiction.  After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC.  S. Rep. No. 93-1131, at 31 (1974).  The

5

language ensured that "where the jurisdiction of the [CFTC] is applicable, it supersedes State as well as Federal agencies." *Id.* at 23.  The Senate also "struck" the existing CEA provision that preserved states' authority to regulate derivatives transactions.  H.R. No. 93-1383, at 35 (1974) (Conf. Rep.).  As the conference report explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.*

The CFTC's regulatory framework is extensive, comprehensive, and exclusive.  To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market.  7 U.S.C. §§ 6(a), 7(a); 17 C.F.R. § 38.3(a).  The exchange's application must detail its capacity to comply with all CFTC rules and regulations through written submissions and exhibits.  17 C.F.R. § 38.3(a)(2).  The CFTC then reviews the application and renders a decision on the exchange's designation.  *Id.* § 38.3(a)(1).

Once the CFTC designates an entity as a contract market—known as a "DCM"—the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).  This exclusive jurisdiction extends to event contracts.  *See id.* §§ 1a(47)(A)(ii), (iv), (vi).  The CFTC also regulates derivatives on "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as

particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences.  *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9).

DCMs are subject to the CFTC's extensive regulatory framework as set out in the CEA and CFTC regulations.   Together, these provisions establish a comprehensive scheme for regulating DCMs.  *See Flaherty*, 2026 WL 924004, at *2.  The CEA prescribes a specific method by which the CFTC may approve new contracts on DCMs.  A DCM that abides by the CEA requirements may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).  The contracts are effective on the first day after the Commission receives the certification unless the CFTC initiates a review.  *See* 17 C.F.R. § 40.2(c).  The CFTC "shall approve a new contract" unless it finds the contract would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  If a DCM offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including revocation of licensing, civil penalties, and criminal enforcement.

In 2010, Congress amended the CEA to add a "Special Rule" specifically addressing event contracts, which are "agreements, contracts, transactions, or swaps

in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.*; *see also* 17 C.F.R. § 40.11(c) (public interest review under Special Rule). The decision to prohibit an event contract that falls within any of these categories is subject to the CFTC's evaluation of the "public interest." *See KalshiEX*, 2024 WL 4164694, at *3 ("[T]he CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves" one of the enumerated categories). The Special Rule further provides that no contract "determined by the Commission to be contrary to the public interest . . . may be listed or made available for clearing or trading on or through a registered entity." 7 U.S.C. § 7a-2(c)(5)(C)(ii).

## B.    Kalshi's Federal Registration as a CFTC-Regulated Designated Contract Market.

In 2020, the CFTC certified Kalshi as a DCM, affirming that its platform complies with the CEA's regulatory requirements. *KalshiEX*, 2024 WL 4164694, at *4. Because Kalshi is a DCM, its event contracts are subject to the CFTC's

"exclusive jurisdiction."   7 U.S.C. § 2(a)(1)(A).   Federal law requires Kalshi to comply with a host of federal requirements designed to ensure market integrity.  An exchange's status as a DCM "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement*, *Inc. v. Bd. of Trade of Chi.,* 977 F.2d 1147, 1150–51 (7th Cir. 1992).

Kalshi offers event contracts related to economics, finance, health, cryptocurrencies, popular culture, and sports.  Compl. ¶ 61.  For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will exceed 50% in 2030.  *Id.* Shortly after Kalshi self-certified its first sports event contract in January 2025, the CFTC requested that Kalshi submit a demonstration of compliance with the CEA for those contracts, pursuant to 17 C.F.R. § 38.5(b).  Compl. ¶ 63.  Kalshi responded with lengthy memoranda detailing its listings' compliance with applicable rules and regulations.  *Id.*  The CFTC took no further action, and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed.  *Id.* ¶ 64.  These contracts, like all of Kalshi's contracts, are lawful under federal law and fall under the CFTC's exclusive jurisdiction.  *Id.* ¶¶ 2, 18.

9

**C.      The Montana Gambling Regulatory Scheme.**

The GCD has asserted its mistaken belief that Kalshi is participating in illegal gambling.  Under Montana law, "gambling" includes "risking any money, credit, deposit, check, property, or other thing of value for a gain that is contingent in whole or in part upon lot, chance, or the operation of a gambling device or gambling enterprise."   MCA §§ 23-5-157, 23-5-112(14)(a).   The GCD has argued that Montana law "prohibits all forms of public gambling in Montana unless specifically authorized by statute."   Porter Decl. Ex. 1, at 1.   Violations of Montana's anti-gambling laws may result in criminal prosecution, permanent injunctions, and other enforcement measures.  *See* MCA §§ 23-5-113, 23-5-136, 23-5-161 (misdemeanor offenses), 23-5-162 (felony offenses).

The GCD has stated that it has conducted an investigation into Kalshi and concluded that all of Kalshi's event contract offerings in Montana "constitute illegal gambling" pursuant to Montana law.  Porter Decl. Ex. 3, at 1.  The GCD has demanded that Kalshi halt its offering of event contracts in Montana, stating that it "expect[ed]" Kalshi to "voluntarily comply" with its order, and that "[r]efusal to do so will result in legal action against Kalshi." *Id.* at 3.  The implication is that Kalshi may face criminal prosecution in Montana for offering its event contracts, which are lawful under federal law.

10

**D.      Montana's Cease-and-Desist Letters and Non-Enforcement Agreement.**

On or about March 26, 2025, the GCD sent Kalshi a cease-and-desist letter (the "March 2025 C&D") asserting that Kalshi's event contracts constitute illegal gambling under Montana law and directing Kalshi to cease offering such contracts to persons located within the State.  Porter Decl. Ex. 1.

On April 11, 2025, Kalshi's outside counsel met with GCD representatives and reached a non-enforcement agreement.  Porter Decl. Ex. 2, at 2-3.  The GCD agreed that it would "not initiate any civil or criminal enforcement against Kalshi during the pendency of" ongoing litigation between Kalshi and Nevada officials, in which Kalshi had obtained a preliminary injunction.  *Id.* (citing *KalshiEX LLC v. Hendrick, et al.*, No. 2:25-cv-00575-APG (D. Nev.)).  The GCD further agreed that Montana "intend[ed] to defer any enforcement pending the outcome of the proceedings before Chief Judge Gordon in Nevada and any appeal to the Ninth Circuit," and that "when those proceedings conclude, Montana authorities will provide Kalshi with reasonable notice before attempting to commence any civil or criminal enforcement action."  *Id.* at 3.  On April 16, 2025, Montana authorities confirmed their "concur[rence]" with this understanding in writing.  *Id.* at 2.  That agreement remained undisturbed for nearly a year.

The proceedings in Nevada are still ongoing, and the Ninth Circuit heard argument on Thursday, April 16, 2026.  Despite that, on April 6, 2026, the GCD

11

mailed another cease-and-desist letter (the "April 2026 C&D") to Kalshi. The April 2026 C&D mischaracterized the prior agreement, and again stated that the GCD had "conducted an investigation into [Kalshi's] activities in" Montana and concluded that they "constitute illegal gambling within the meaning of Montana law." Porter Decl. Ex. 3, at 1. It concluded by threatening that unless Kalshi ceased its federally regulated operation in Montana as to all of Kalshi's event contract offerings, the result would be "legal action against" Kalshi. *Id.* at 3.

Kalshi received the April 2026 C&D by mail on Saturday, April 11, 2026. Shortly thereafter, counsel for Kalshi reached out to Attorney General Knudsen, expressing confusion over receipt of the April 2026 C&D in light of Kalshi's written agreement to preserve the status quo during the pendency of the *Hendrick* appeal, and asking to speak with the Attorney General or a member of his team over the weekend. Although the Attorney General responded to confirm he would look into the issue, he did not reply further. On April 12, 2026, concerned by the lack of response, counsel for Kalshi contacted representatives of the GCD and Attorney General's office that it met with in April 2025 (including the author of the April 2026 C&D). Porter Decl. Ex. 2, at 1-2. Kalshi explained that it understood the letter "to be a statement that the GCD views our prior agreement as no longer in effect" and requested a response by 8 p.m. that evening if that was not correct. *Id.* The email made clear that Kalshi understood the April 2026 C&D as a threat of legal

action, and Kalshi's counsel offered to make themselves available at any time for a discussion. *Id.* Kalshi received no response and filed the Complaint.

Following the filing of the Complaint, counsel for Kalshi and Defendants' counsel engaged in discussions regarding the need for Kalshi to seek immediate relief in the form of a temporary restraining order, and reached an agreement obviating the need for Kalshi to do so. The parties additionally agreed that while Kalshi would file this motion for a Preliminary Injunction, it would be productive for the parties to engage in further discussions regarding the issues raised in the Complaint and this motion. Accordingly, concurrent with the filing of this motion, the parties are jointly submitting a Stipulated Motion to Stay Case Deadlines to provide the parties with an opportunity to engage in those discussions, and directing the parties to provide a status update to the Court within sixty days.

While Kalshi hopes those discussions will be productive, the statements in the April 2026 C&D make clear Kalshi faces an imminent threat that Montana may seek to subject Kalshi to an enforcement action brought under preempted state law. Kalshi has no choice but to respectfully request that this Court enter a preliminary injunction.

## ARGUMENT

Federal Rule of Civil Procedure 65 governs preliminary injunctions and TROs. To obtain such relief, the moving party must demonstrate: (1) likelihood of

13

success on the merits; (2) likelihood of irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships . . . tips sharply towards' it, as long as the second and third Winter factors are satisfied." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted). For the same reasons district courts in Tennessee and New Jersey granted Kalshi a TRO and preliminary injunction—and the Third Circuit upheld the latter—Kalshi satisfies each element.

A.    **Kalshi Is Likely to Succeed Because Montana's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations.**

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law expressly or impliedly. One manner of preemption is field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Federal law also preempts state law where compliance with both is impossible or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). It is

14

well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vand. L. Rev. 1, 2 (1976) https://perma.cc/DW9Y-V7G3. Montana's gambling laws are no exception.

1.    <u>Kalshi's Event Contracts Are Swaps Subject to the CEA's Exclusive Jurisdiction.</u>

As a threshold matter, Kalshi's event contracts are swaps under the plain language of the CEA. Kalshi's contracts "provide[]" for payment based on the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). "Associated" commonly means "connect[ed]." *See Associated*, Oxford English Dictionary (3d ed. 2011). A swap thus requires an event connected to a potential financial, economic, or commercial consequence. Congress's choice of "potential" is "broad." *Flaherty*, 2026 WL 924004, at *4; *Orgel*, 2026 WL 474869, at *8.

All of Kalshi's contracts, including its sports event contracts, fit comfortably within this definition. The outcomes of sporting events likewise are connected with financial consequences—often significant ones—for a broad ecosystem of stakeholders, including team sponsors, advertisers, television networks, franchises, local communities, and more. They also have direct economic consequences for

15

state-regulated sportsbooks, which face substantial financial risks associated with sports events (if their customers win, they lose, providing a natural hedging need). Some sportsbooks have turned to Kalshi's contracts to hedge their financial risks accordingly.

Kalshi's contracts are also futures or options in "excluded commodities." Excluded commodities include intangibles such as commercial benchmarks. *See* 7 U.S.C. § 1a(19). Congress also expressly defined "excluded commodity" to include "occurrence[s]" that are "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence— for example, the occurrence or severity of a hurricane. Kalshi's event contracts likewise pay out based on financially significant occurrences and thus are "of the character of" futures and options, as understood by derivatives markets. *See id.* § 1a(36) (defining "option").

Several textual features constrain the definition of "swap" to prevent any parade of horribles. *First*, an event giving rise to a swap transaction must have potential financial, economic, or commercial consequences independent of the transaction itself. 7 U.S.C. § 1a(47)(A)(ii). *Second*, for an event to qualify as a commodity, it must be "beyond the control of the parties." *Id*. § 1a(19)(iv)(I). *Third*, Congress followed its definition with express "[e]xclusions" for certain securities,

16

notes, and foreign currency transactions. *Id*. §§ 1a(47)(B)(iii)–(vii). *Fourth*, the CFTC and SEC have authority to "further define" swaps and have excluded "customary consumer and commercial agreements" not traded "on an organized market." Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,246 (Aug. 13, 2012). Kalshi's contracts comfortably fall within these constraints.

The Special Rule confirms that Congress considered "event contracts" to be subject to CFTC jurisdiction, regardless of whether they are understood as swaps or futures. *Id.* § 7a-2(c)(5)(C)(i). That provision gives the CFTC jurisdiction to review specified types of "agreements, contracts, transactions, or swaps in excluded commodities." *Id.* The CFTC itself has repeatedly confirmed that it understands Kalshi's contracts to fall within that provision. In 2008, before the CFTC's jurisdiction encompassed swaps, it recognized that event contracts, which may be based on "varied" eventualities such as "the results of political elections, or the outcome of particular entertainment events," could be structured as "futures" or "options." Concept Release, 73 Fed. Reg. 25,669, 25,669-71 (May 7, 2008).

    2.    Montana's Gambling Laws Are Expressly and Impliedly Field Preempted as Applied to Kalshi's Event Contracts.

Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n. 6. Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g., Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–13 (1983). Courts can also infer field preemption from

17

a scheme of "federal statutory directives" that "provide a full set of standards" designed to function "as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines*, 312 U.S. at 72). "Where Congress occupies an entire field," "even complementary state regulation is impermissible." *Id.* Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation. Every marker of congressional intent confirms that Congress has preempted the field. *See Flaherty*, 2026 WL 924004, at *4 (agreeing that "at the very least field preemption applies").

 *Statutory Text*:  The text of the 1974 amendments to the CEA could hardly be clearer. Congress established the CFTC and granted it "exclusive jurisdiction" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.

 The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities. *Mississippi v. Louisiana*, 506 U.S. 73, 77–78 (1992). The Supreme Court has repeatedly instructed that state law is preempted where a federal agency's jurisdiction is "exclusive." *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150,

163 (2016).  Courts have found that statutes containing similar language preempt parallel state law regulation.  *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1194 (10th Cir. 2022).  Where a statute "contains an express pre-emption clause, [courts] do not invoke any presumption against preemption."  *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016).  The presumption against preemption applies only outside the express preemption context—it has no application where, as here, Congress has spoken directly by granting the CFTC "exclusive jurisdiction."

Other features of Section 2(a)'s text confirm its preemptive effect.  The statute contains a savings clause providing it does not "supersede" state regulatory authority, but the clause applies "[e]xcept as hereinabove provided" by the exclusive jurisdiction grant.  7 U.S.C. § 2(a)(1)(A).  That proviso enables a "logical inference" of preemption as to matters within the CFTC's exclusive jurisdiction.  *Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 194-196 (9th Cir. 2013).  Because the savings clause clarifies that state law is not "supersede[d]" as to off-DCM transactions, it confirms that state law is superseded as to on-DCM transactions.  Congress added the proviso specifically to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies."  S. Rep. No. 93-1131, at 6.

19

*Statutory Purpose*:  Congress in the 1974 Act sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ from one jurisdiction to the next.  One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation."  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  As one sponsor explained, "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).

Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 82 (1974).  The Conference Report confirmed Congress's intent to preempt the field:  "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned."  H.R. No. 93-1383 at 35 (Conf. Rep.) (1974) (emphasis added).

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC.  Writing for the Second Circuit, for example, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges.  *Leist*, 638 F.2d at 322; *see also Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act").

20

Defendants' effort to regulate Kalshi's event contracts cannot be reconciled with that clear congressional purpose.

*Drafting History*:  The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi.  To "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading.  120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis); *see also Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947).  After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC.  S. Rep. No. 93-1131, at 31 (1974).  The language ensured that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies."  *Id.* at 6.  These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had relied on "to hold that the CEA did not preempt state regulation."  Van Wart, supra, at 692–93.  "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987).  The Senate's decision to omit provisions allowing concurrent

21

state jurisdiction over trading on DCMs is further proof of Congress's intent to preempt parallel state regulation.

*The CFTC's Position*:  The CFTC views prediction markets as subject to its exclusive jurisdiction.  In 2024, the CFTC informed the D.C. Circuit that "due to federal preemption, event contracts never violate state law when they are traded on a DCM."  Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (No. 24-5205).  Last month, the CFTC stated that "commodity derivatives markets require nationally uniform rules . . . to prevent the type of fragmented oversight" that would result from state enforcement.  CFTC Amicus Br. ("CFTC Amicus Br.") at 1, *N. Am. Derivatives Exch., Inc. v. Nevada,* No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2.  In the CFTC's view, event contracts, including sports-event contracts, fall "comfortably within" the CEA and under its regulatory authority.  *Id.* at 19.

Recently, the CFTC and the U.S. Department of Justice initiated litigation against three states—Arizona, Connecticut, and Illinois—to prevent them from applying state gambling laws to event contracts traded on CFTC-regulated DCMs (as Defendants seek to do here), confirming the CFTC's view that trading of Kalshi's event contracts is subject to its exclusive jurisdiction.  *See generally* Complaint*, United States v. Arizona*, 2:26-cv-02246 (D. Ariz. Apr. 2, 2026), Dkt. No. 1; Complaint, *United States v. Connecticut*, 3:26-cv-00498 (D. Conn. Apr. 2, 2026),

Dkt. No. 1; Complaint, *United States v. Illinois*, 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1. Days ago, a federal court in the District of Arizona granted the CFTC's motion for a Temporary Restraining Order barring Arizona state gaming regulators from enforcing laws materially similar to those Montana seeks to enforce here. Order at 4, *Johnson*, 2:26-cv-01715-MTL, Dkt. No. 65. The court "agree[d] with and adopt[ed] the view that 'if event contracts are swaps under the [CEA], . . . the scope of field preemption [is] the regulation of trading on a DCM.'" *Id.* at 3 (citing *Flaherty*, 2026 WL 924004, at *4). The Third Circuit, Tennessee, Nevada, and Arizona federal courts have all agreed on this scope of the field.

The CFTC's March 12, 2026 Advance Notice of Proposed Rulemaking Related to Prediction Markets supports the agency's position that prediction markets are subject to its exclusive jurisdiction. *See* Prediction Markets, 91 Fed. Reg. 6351, 6354 n. 5 (2026) (noting that Section 2(a)(1)(A) "expressly extends the CFTC's 'exclusive jurisdiction' to encompass 'transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to [CEA section 5, 7 U.S.C. 7] ….'"); *see also* Prediction Markets Advisory, CFTC Letter No. 26-08, at 1 (Mar. 12, 2026) (providing DCMs with guidance regarding their responsibilities as to the listing of event contracts that may carry risk of manipulation).

23

*Comprehensive Regulatory Scheme*:    The comprehensive nature of the regulatory scheme Congress created for DCMs further evidences that Congress intended to foreclose concurrent state jurisdiction.  *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368–69 (1986).  As the Supreme Court has found, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."  *Merrill Lynch*, 456 U.S. at 356 (quoting H.R. Rep. No. 93-975, at 1 (1974)).  An exchange may only offer derivatives after undergoing an extensive review process and receiving the CFTC's designation as a DCM.  7 U.S.C. §§ 2(e), 6(a), 7(a); 17 C.F.R. § 38.100.  Once an exchange is designated as a DCM, the CFTC enjoys "exclusive jurisdiction" over the derivatives traded on the market. 7 U.S.C. § 2(a)(1)(A).  DCMs are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* § 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties, *id.* pt. 38.  Congress elected to allow DCMs to list contracts by self-certifying that they comply with the CEA's requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2).  Congress then gave the CFTC back-end authority to conduct a review of a contract if it believes the contract may run afoul of any statute or regulation.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).  Violations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

24

Of particular relevance here, the Special Rule specifically authorizes the CFTC to bar certain event contracts deemed "contrary to the public interest" and "involv[ing]" certain categories of activities.  7 U.S.C. § 7a-2(c)(5)(C)(i); *see generally* 17 C.F.R. § 40.11.  The Special Rule is not mandatory—the CFTC "may" prohibit a contract involving a listed activity or may determine that such a contract would not be contrary to the public interest.  *Id.*  Congress thus left the decision to one federal authority—not 50 separate states and the District of Columbia.  *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025) (because the CFTC has "exclusive jurisdiction," "the only enforcement mechanism belongs to the [CFTC]"); CFTC Amicus Br. at 21 (the CEA's "exclusive jurisdiction" provision "preempts application of state gambling laws to event contracts trading on DCMs.").

Congress granted an enforcement role to states—but that role expressly excludes the right to enforce state laws against DCMs.  The CEA authorizes state officials to bring suit regarding CEA violations, but a proviso limits that authorization to actions against parties "other than a [designated] contract market." 7 U.S.C. § 13a-2(1).  The CEA also allows states to enforce "antifraud" laws, but not antigambling laws.  *Id.* § 13a-2(7); *see e.g.*, *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981) ("[T]his specific allowance of antifraud proceedings must be deemed to preclude antigambling proceedings.");

*McGee v. Gerstenberg and Co.*, 1986 WL 4183, at *2 (N.D. Ill. Mar. 25, 1986) ("Although the CEA establishes the [CFTC] as the exclusive regulatory agency, it does not preclude the states from enforcing their own general antifraud statutes."). Congress further made clear that the CEA does not "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so.  7 U.S.C. § 16(e)(1)(C).  In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees but permitted federal and state agencies to police "those who offer fraudulent off-exchange investments" and other "transactions outside those preserved exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 44 (1982).  The CEA does not call into question the state's authority to regulate casinos or entities that are not DCMs.  But the CEA's comprehensive scheme for regulating DCMs evinces Congress's intent to preempt the field.

Other federal laws reinforce this intent.  The Unlawful Internet Gaming Enforcement Act of 2006 ("UIGEA") generally prohibits use of the internet to transmit wagers between states "where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), but provides that the term "bet or wager" "does not include" transactions conducted on "a registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E).  UIGEA underscores Congress's understanding that, under the CEA, state gambling laws do not reach trading on DCMs.  *See Blue Lake*

*Rancheria*, 2025 WL 3141202, at *6 (Kalshi's "internet contracts are not bets or wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling' even if the contracts are received, placed or transmitted from persons" where gambling is unlawful under local law).

3.      Montana Laws Are Conflict-Preempted as Applied to Kalshi.

As multiple federal courts recently held regarding similar state laws, *see Flaherty*, 2026 WL 924004, at *4; *Orgel*, 2026 WL 474869, at *9-10, Montana gambling laws are conflict-preempted as applied to Kalshi.  It would be "impossible" for Kalshi "to comply with both state and federal law," and Montana's laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA.  *Crosby*, 530 U.S. at 372-73.  Subjecting Kalshi's event contracts to Montana law would conflict with the CEA in at least three respects.

*First*, Congress passed the 1974 Amendments to bring futures markets "under a uniform set of regulations." *Am. Agric. Movement*, 977 F.2d at 1156.  "[A] contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.*  The Seventh Circuit held that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the

27

accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156–57 (internal citations omitted).

Courts commonly find conflict preemption where a statute provides for a uniform federal scheme. The Supreme Court has found state law to conflict with federal law where permitting state regulation was "at odds with the goal of uniformity that Congress sought to implement." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990); *see Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 393-95 (9th Cir. 2002) (finding conflict preemption where "[t]he application of different state standards would disrupt the nationally uniform administration" provided by federal statute).

Subjecting Kalshi to Montana's gambling laws would conflict with Congress's goal of a uniform federal scheme. Piecemeal state-by-state regulation is precisely what Congress sought to avoid, and the conflict is made even clearer when considering the possibility that 49 other states might also attempt to subject Kalshi to their own state laws (as several have). That state-by-state regulation would erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. As a Tennessee federal court recently held in granting Kalshi a preliminary injunction, "state law likely stands as an obstacle to . . . the CEA's primary objective: uniform regulation of the derivatives market"

28

because it "would directly affect trading on Kalshi by limiting who can trade with whom." *Orgel*, 2026 WL 474869, at *10.

*Second*, compliance with Montana law would be impossible. The GCD has demanded that Kalshi "cease and desist its illegal activities within the State of Montana" and halt its offering of event contracts. Porter Decl. Ex. 3, at 1, 3. Complying would require Kalshi to limit access to its exchange based on a user's geographic location. The requirement to exclude users based solely on their location in one state would be impossible for a nationwide exchange like Kalshi, which is required by federal law to "provide its members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b); CFTC Amicus Br. at 25-26 (noting that "a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide," and that a DCM "cannot fulfill its federal mandate" if it imposes geographical restrictions).

But the problem extends beyond impartial access. Applying state gaming laws on a state-by-state basis would force a single federally licensed exchange to operate multiple, separate liquidity pools with different prices for the same contracts—one for Nevada, another for Montana, another for Maryland, and so on. Such fragmentation is susceptible to manipulation and raises serious market surveillance challenges, both of which implicate core DCM principles. *See* 7 U.S.C.

29

§ 7(d)(3) (contracts must not be "readily susceptible to manipulation"); *id*. § 7(d)(4) (DCMs must "prevent market disruption"). This fragmentation would fundamentally undercut the central purpose of the CEA, as reflected in 7 U.S.C. § 5, which is to provide a nationwide market for price discovery and to deter and prevent price manipulation. If Montana could subject Kalshi to state laws, 49 other states could do the same, resulting in the patchwork that Congress recognized would make operating a DCM impossible. As CFTC counsel recently warned: "[W]e would have 50 state regulations that all have different interpretations of what a swap is or is not," and "the CFTC is not equipped, nor are our regulated entities, nor the market participants, to go and comply and try and figure out how those state regulations fit with the CEA." Porter Decl. Ex. 4 at 12:18–13:7.

*Third*, a state law stands as an "obstacle" where it hampers "the careful balance struck by Congress." *Arizona*, 567 U.S. at 406. Where Congress "entrust[s]" the federal government with "discretion" over violations of federal law, a state regime that allows for state prosecutions of the same actions is "preempted by federal law." *Id.* at 407-10. Otherwise, a state could bring charges "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402. Congress authorized the CFTC to review contracts involving "gaming" and bar them if "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC declined

30

to initiate such review. Compl. ¶ 64. Allowing states to impose their own judgments would nullify the CFTC's exclusive right to engage in public-interest review. *See Crosby*, 530 U.S. at 380.

**B.     Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction.**

The Ninth Circuit "presume[s] that a constitutional violation causes a preliminary injunction movant irreparable harm and that preventing a constitutional violation is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1046 (9th Cir. 2023). The loss of market share or business opportunities also constitutes irreparable harm. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *CH2O, Inc. v. Meras Eng'g, Inc.*, 2017 WL 1700844, at *2 (C.D. Cal. May 2, 2017) (loss of "market position and share" shows irreparable harm). The analysis "focuses on irreparability, 'irrespective of the magnitude of the injury.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Defendants' actions threaten Kalshi with a "Hobson's choice" giving rise to irreparable harm—either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). As the Third Circuit recently held, Kalshi suffers irreparable harm in several respects. *See Flaherty*, 2026 WL 924004, at *6; *Orgel*, 2026 WL 474869, at *10–11; *Flaherty*, 2025 WL 1218313, at *6–7.

31

*First*, if Kalshi chooses not to comply with Defendants' threats, Kalshi and its officers face the harms associated with criminal prosecution.  A party facing imminent enforcement under a preempted state statute suffers "irreparable injury." *Morales*, 504 U.S. at 381; *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).  Four other states recently commenced enforcement proceedings against Kalshi, confirming a real threat of enforcement.  *See State of Arizona v. KalshiEX LLC et al.*, Nos. CR2026-173-1, 173-2 (Ariz. Super. Ct. Maricopa Cnty.); *Commonwealth of Mass. v. KalshiEX LLC*, No. 2584-cv-02525 (Mass. Sup. Ct.); *State of Nevada ex rel. Nevada Gaming Control Bd. v. KalshiEX LLC*, No. 260000050-1B (Nev. Dist. Ct.); *People ex rel. Nessel v. KalshiEX LLC*, No. 26-001087-CZ (Mich. Cir. Ct. Ingham Cnty.); *State of Washington v. KalshiEX LLC*, No. 26-2-10264-3 SEA (Wash. Super. Ct. King Cnty.).  Defendants' threats generate uncertainty that will harm Kalshi and its business relationships.

*Second*, compliance with Defendants' threats would subject Kalshi to extensive unrecoverable harms.  Kalshi has nearly 21,000 users in Montana with millions of dollars in open contracts.  Sottile Decl. ¶ 33.  Compliance would require Kalshi to forgo this business, with no prospect of recouping losses.  Moreover, forcing Kalshi to cease operating in Montana would subject Kalshi to extraordinary technological challenges and costs.  Kalshi has no current obligation to geolocate its users on a real-time, state-by-state basis.  *Id.* ¶ 27.  Attempting to implement

32

geolocation capabilities would take months and cost tens of millions of dollars annually. *Id.* ¶¶ 29–31. And because the Eleventh Amendment bars damages against state officials, Kalshi would have no way of recovering its losses. *See Azar*, 911 F.3d at 581 (concluding monetary harm "is irreparable here because [plaintiffs] will not be able to recover monetary damages" due to damages immunity).

*Third*, a preliminary injunction is needed to protect not only Kalshi but also its users. Immediately shuttering access to contracts for Montana users could require Kalshi to terminate contracts and liquidate users' positions, or to pause trading pending the outcome of litigation. Sottile Decl. ¶¶ 44-45, 51. Either scenario would harm users not just in Montana but nationwide, because cutting off access to users in one state would substantially distort the markets and contract prices for users in other states. People "located in Montana" are inevitably transacting with persons located in other states, meaning the harms from Defendants' threats would be suffered nationwide—including in New Jersey and Tennessee, where federal courts have preliminarily enjoined enforcement of state laws against Kalshi. Sottile Decl. ¶¶ 45, 49. Such "impair[ment of] existing contractual obligations" constitutes irreparable harm. *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1051–52 (S.D. Cal. 2006); *see FTC v. Qualcomm, Inc.*, 935 F.3d 752, 756 (9th Cir. 2019).

*Fourth*, Kalshi will face irreparable reputational harm if no injunction is granted. If a Montana enforcement action against Kalshi is not preempted, the threat

33

of prosecution undermines its reputation as a lawfully licensed DCM. But bowing to Defendants' threats would undermine users' confidence and make them fear their positions are at risk. Sottile Decl. ¶¶ 61-64. This loss of goodwill cannot easily be regained and constitutes irreparable harm. *See Herb Reed Enters., LLC*, 736 F.3d at 1250; *see Disney Enters., Inc.* 869 F.3d at 866 (loss of goodwill cannot readily be remedied with damages). Moreover, abruptly terminating Kalshi's event-based contracts in Montana would risk violating CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255. *See* CFTC Amicus Br. at 25–26 (noting a DCM "cannot fulfill its federal mandate" if it complies with state-by-state regulation). A preliminary injunction is needed to prevent Kalshi from suffering irreparable harm during the pendency of this litigation.

**C.     The Balance of the Equities and Public Interest Favor a Preliminary Injunction.**

When the government is a party to a lawsuit, the Ninth Circuit "consider[s] the balance of equities and the public interest together." *Azar*, 911 F.3d at 581. When deciding whether to issue a preliminary injunction, "courts must balance the competing claims of injury and [must] consider the effect" on each party of "granting or withholding" relief. *Winter*, 555 U.S. at 12. The Ninth Circuit has held that "plaintiffs who are able to 'establish[ ] a likelihood that [a] policy violates the U.S.

34

Constitution . . . have also established that both the public interest and the balance of the equities favor a preliminary injunction.'" *Baird*, 81 F.4th at 1042.

"[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol*, 732 F.3d at 1029. "In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Cal. Pharmacists Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009). The Third Circuit, Tennessee district court, and New Jersey district court all found as much. *Flaherty*, 2026 WL 924004, at *6; *Orgel*, 2026 WL 474869, at *11; *Flaherty*, 2025 WL 1218313, at *7. Montana, by contrast, lacks any interest in enforcing a preempted state law—especially a law that, by its terms, excludes lawful contracts like Kalshi's event contracts. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010); *Arizona,* 567 U.S. at 401.

Beyond that, the failure to issue an injunction would "reach[] beyond the parties, carrying with it a potential for public consequences." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). Ceasing operations in Montana would harm Kalshi's users and impose intractable technological difficulties. Sottile Decl. ¶¶ 20–65. Abrupt cessation would make it difficult to inform users in Montana of their rights and obligations regarding ongoing event contracts and cut off their access to positions on Kalshi's exchange. *Id.* ¶ 48. The harms would be suffered by

counterparties nationwide, including in Tennessee and New Jersey, where similar enforcement actions have been enjoined. *Id.* ¶ 49. Because Montana's laws are preempted as applied to Kalshi, the balance of the equities and public interest firmly favor preliminary relief.

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction.

DATED: April 21, 2026.

Respectfully submitted,

**LAIRD COWLEY, PLLC**

/s/ Ryan G. Weldon
Ryan G. Weldon

and

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Matthew J. Laroche (*pro hac vice* forthcoming)
Kelly D. Garcia (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*

37

## CERTIFICATE OF SERVICE

I hereby certify that on the date of the filing, a copy of the foregoing was served upon the following person by the following means:

| | |
|---|---|
| [  ] U.S. Mail | Christian B. Corrigan |
| [  ] Hand Delivery | Solicitor General |
| [X] Email | Montana Department of Justice |
| [  ] CM/ECF | 215 N Sanders |
| [  ] Certified Mail, Return | Helena, MT 59601 |
| Receipt Requested | Christian.Corrigan@mt.gov |

*Attorney for Defendants*

**LAIRD COWLEY, PLLC**

By:   /s/ Ryan G. Weldon
        Ryan G. Weldon
        Attorneys for Plaintiff KalshiEx LLC

38