IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| KALSHIEX LLC, | Case No. 6:26-cv-00028-JTJ |
| Plaintiff, | |
| vs. | DECLARATION OF XAVIER SOTTILE |
| AUSTIN KNUDSEN, in his official capacity as Attorney General of Montana, *et al*., | |
| Defendants. | |

I, Xavier Sottile, declare as follows:

1.    I am the Head of Markets at KalshiEX LLC.  In that role, I am responsible for the generation of new markets.  I received an undergraduate degree in economics from Yale University in 2020.  Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

2.    My duties include devising proposed new contracts and shepherding those proposals from inception to completion.  I also facilitate the process by which our markets undergo the regulatory review cycle under the purview of the Commodity Futures Trading Commission ("CFTC" or the "Commission").  This involves everything from personally notifying the CFTC of contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act (the "CEA") and Section 40.2(a) of the CFTC regulations to maintaining records pursuant to their

requirements, certifying that Kalshi's contracts comply with the Act, and communicating with Commission staff over the substance of contract filings.

3.      The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

4.      I offer this Declaration to provide additional information about Kalshi's business and to describe the extraordinary harm that Kalshi and its users will incur unless the Court immediately prevents the Montana officials from acting on their threat to force Kalshi to cease offering event contracts in Montana.  Porter Decl. Exs. 1, 3.  Without an injunction, Kalshi will be forced into an impossible choice.  It must either decline to comply with Montana's threats, subjecting itself and its representatives to the risk of criminal liability.  *Id.*  Or it must attempt to comply with Montana law and exit the market, thereby subjecting itself and its users to a host of harms that could not be repaired even if Kalshi ultimately succeeds in this case.  This Declaration reflects my preliminary analysis of Kalshi's harms.  Other unanticipated harms are possible, and even likely, given the nature of Montana's threats of enforcement and the uncharted territory into which it would lead.

**A.      Kalshi's Event Contracts**

5.      Pursuant to section 7a-2(c)(1) of the CEA, Kalshi self-certifies all contracts that are available on its exchange.  Those certifications contain extensive

information, including in confidential appendices not available to the public, for the CFTC's review.

6.    While the CFTC could subject these contracts to a 90-day review under 17 C.F.R. § 40.11(c) to determine whether they fall under certain enumerated categories and are "contrary to the public interest," the CFTC has not currently initiated such a review of any of Kalshi's contracts.

7.    On January 31, 2025, the CFTC requested, pursuant to 17 C.F.R. § 38.5(b), that Kalshi submit a demonstration of compliance for two sports-event contracts with the CEA, and Kalshi responded with a memo that detailed the listings' compliance with all applicable rules and regulations.

8.    Kalshi also provided the CFTC with a memorandum from its outside counsel addressing, among other things, the CFTC's authority to regulate trading of sports-event contracts on DCMs.

9.    The CFTC took no further action with respect to Kalshi's self-certifications of sports-event contracts.

**B.    Harms Resulting from Noncompliance**

10.    If Kalshi declines to comply with the Montana law as interpreted by the Defendants and continues to offer event contracts in the state of Montana, the company and its representatives risk civil liability and criminal jeopardy in Montana.

11.     Montana authorities view Kalshi as illegal, presenting Kalshi with an imminent threat of an enforcement action or lawsuit against it.  Porter Decl. Ex. 1, 3.  Montana officials have expressed that they believe that Kalshi's operations in Montana are in violation of Montana law.  *Id.*

12.     On March 26, 2025, the Montana Gambling Control Division ("GCD") sent Kalshi a cease-and-desist letter (the "March 2025 C&D") claiming that Kalshi's event contracts constitute illegal gambling under Montana law and directing Kalshi to cease offering such contracts to persons located within the State.  Porter Decl. Ex. 1.  The GCD warned that violations of Montana's anti-gambling laws may result in criminal prosecution, permanent injunctions through administrative proceedings or the courts, and other enforcement measures.  *Id.*; *see* MCA §§ 23-5-113, 23-5-136.

13.     The GCD further noted that unlawful gambling constitutes a crime in Montana.  *See* MCA §§ 23-5-161 (misdemeanor offenses); 23-5-162 (felony offenses).  The GCD also declared that it would construe Kalshi's continued operations as constituting illegal gambling and would pursue "legal action."  Porter Decl. Ex. 1 at 2.

14.     On April 11, 2025, Kalshi's outside counsel met with representatives of the GCD and reached a non-enforcement agreement.  Porter Decl. Ex. 2 at 2-3.  The GCD agreed that it would "not initiate any civil or criminal enforcement against Kalshi during the pendency of" an ongoing litigation between Kalshi and Nevada

officials, in which Kalshi had obtained a preliminary injunction. *Id.* (citing *KalshiEX LLC v. Hendrick, et al.*, No. 2:25-cv-00575-APG (D. Nev.)). The GCD further agreed that Montana "intend[ed] to defer any enforcement pending the outcome of the proceedings before Chief Judge Gordon in Nevada and any appeal to the Ninth Circuit," and that "when those proceedings conclude, Montana authorities will provide Kalshi with reasonable notice before attempting to commence any civil or criminal enforcement action." *Id.* at 2-3. That agreement remained undisturbed for nearly a year.

15.    Montana officials reiterated this position in subsequent communications. On April 6, 2026, the GCD mailed Kalshi another cease-and-desist letter (the "April 2026 C&D"), mischaracterizing the parties' prior non-enforcement agreement and concluding that Kalshi's event contract offerings in Montana "constitute[] illegal gambling and illegal sports wagering pursuant to Montana law." Porter Decl. Ex. 3 at 2. The April 2026 C&D threatened that unless Kalshi ceased its operations in Montana, the result would be "legal action against Kalshi." *Id.* at 3.

16.    Defendant Austin Knudsen, as Montana's Attorney General, has the authority to enforce Montana's anti-gambling laws against Kalshi. The GCD has

indicated that it may pursue criminal charges or seek permanent injunctions against Kalshi.  Porter Decl. Exs. 1, 3.[1]

17.    Since Kalshi's designation as a CFTC-regulated contract market in 2020, the company has offered event contracts nationwide.  As Head of Markets, I have assiduously complied with federal regulations with regard to all of our contracts.  We have done our best to run the company according to our understanding of the regulatory framework under which we have been governed for more than five years.

18.    Since reviewing statements from Montana officials that challenge Kalshi's operations—which are lawful under federal law—Kalshi has become aware of the risk of enforcement from Montana which would expose the company and representatives to criminal liability.  It is terrifying and stressful to attempt to operate the company while the risk of criminal jeopardy looms.  I am deeply concerned that Montana will make good on its threat to file criminal charges against Kalshi, its representatives, and possibly even its contractual counterparties.  That fear becomes all the more distressing given that Kalshi's only other alternative is compliance with Montana anti-gambling laws, which would bring about a whole host of other harms to Kalshi and its users, as I describe below.

---

[1] *See, e.g.,* Brief of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29 ("June Amicus").

6

**C.   Harms Resulting from Alleged Compliance**

19.   Choosing to comply with Montana anti-gambling laws as interpreted by Montana officials would introduce a new set of barriers and challenges that by themselves would subject Kalshi and its users to irreparable harm.  Technical compliance with Montana law in short order would be exceedingly difficult.  But even if Kalshi could implement a technical solution to comply with Montana's demands, halting access to event contracts in Montana, voiding existing contracts, and refunding deposits to users located in Montana would cause severe harm to Kalshi's existing user base.  Compliance would also risk Kalshi's status as a designated contract market ("DCM") under the CFTC, throwing away years of effort to earn and maintain its federal designation.  All of these harms would be avoided by this Court's entry of immediate injunctive relief.

20.   Kalshi's harms from attempting compliance can be categorized as follows: (a) harms imposed by technical barriers to compliance, (b) harms to Kalshi's users from abruptly ceasing operations in Montana, (c) the risk that complying with Montana law would jeopardize Kalshi's CFTC designation, and (d) economic and reputational harm to Kalshi from ceasing event-based contracts in Montana.  I describe each of these categories in more detail below.

I.    Harms Resulting from Technical Barriers to Compliance

21.    Complying with Montana anti-gambling laws as interpreted by Defendants would require Kalshi to undertake technological changes that would be either difficult or impossible for Kalshi to implement immediately, under the threat of imminent litigation.  Attempting to undertake these extraordinary technological changes would impose substantial and irreparable costs that could not be recouped even if Kalshi ultimately prevails in this case.

22.    Defendants want Kalshi to cease offering event contracts in Montana based on the mistaken assertion that these contracts constitute gambling, which is illegal in the state.  For Kalshi to do so, it would have to, first, undertake efforts to geolocate which of its users are in Montana, and, second, bar access to all event contracts for those users.  This would require Kalshi to geolocate all of its users at all times and have a process to continually void event contracts and refund deposits for people who enter the state of Montana.  I have engaged in internal discussions with our leadership and technical team to determine the feasibility of compliance with all of these demands.  Compliance would be difficult to implement even under a relaxed timeline and could not be done immediately.

a.    Step One – Identifying Montana Users

23.    Because Kalshi is subject to uniform federal regulation rather than state-by-state laws, it currently lacks a mechanism to identify which of its users are

8

located in any particular state at any particular time. Implementing such a mechanism would be incredibly costly and could not be done immediately.

24. Websites that use geofencing technology identify their users' whereabouts through a process called geolocation (or geo-positioning). Geolocation identifies and tracks an internet-connected device's location to provide real-time data as to the geographic position of the device. This technology is more sophisticated than merely identifying the device's IP address. Instead, geolocation uses a combination of location-identifiers like GPS coordinates, cell phone towers, WiFi access points, network connections, and Bluetooth beacons to triangulate location. While IP addresses can provide city-level location accuracy, geolocation is sensitive enough to track the exact moment that a device crosses state lines.

25. It is my understanding that geolocation is a multi-step and technically complex process even for stationary devices, and that the process is even more challenging when tracking the real-time movement of devices.

26. As a CFTC-regulated contract market, Kalshi has never developed or implemented geolocation on its platform because it is subject to the CFTC's exclusive jurisdiction and is not subject to individual state laws governing gambling. Like the Chicago Mercantile Exchange and the Intercontinental Exchange, Kalshi does not distinguish between users or trades on the basis of geographic location.

Instead, Kalshi is subject exclusively to federal law, which does not apply different standards to users of different states.

27.    Kalshi keeps Know Your Customer ("KYC") data on the traders that place positions on its platform.  Kalshi knows the permanent residence and IP address of its users but does not geolocate its users and therefore does not know where a user's device is located at any point in time.  Kalshi maintains a database of its traders' KYC data, which is available for CFTC inspection upon request.

28.    Kalshi has no evident way to cease operations in Montana.  If Kalshi sought to use its existing KYC data to identify Montana-based users on its platform, this broad-brush approach would risk being deemed both under- and over-inclusive. KYC data would capture all users who claim their permanent residence as Montana even if they place positions when they are located outside of Montana.  Conversely, the KYC data could fail to capture users whose permanent residence is outside of Montana but who travel to the state and make a trade while there.

29.    If, alternatively, Kalshi sought to implement geolocation services across its platform, this process would be incredibly costly and time-consuming. Kalshi lacks the capacity to implement this service in-house and would therefore need to contract with a cloud- or server-based geolocation platform.  I estimate that a partnership with a geolocation service provider would cost Kalshi up to tens of millions of dollars annually.  Thus, if Kalshi were required to stop offering event

contracts in Montana, Kalshi would be forced to expend enormous financial resources on geolocating services, even if the court ultimately concludes that Montana law does not apply to Kalshi.

30.     Based on my prior negotiations with other key partners, moreover, I estimate that negotiating a complex contract with a geolocation service provider alone could take months.  Implementing and integrating the geolocation services into our existing platform would take longer still.  Thus, attempting to comply with Montana's demands could not feasibly be done quickly and, even if it could, would subject Kalshi to massive irrevocable costs.

b.     Step Two – Geographical Cessation

31.     Only after identifying Kalshi users who are physically present in Montana could Kalshi cease offering its event contracts to users in Montana and void pending event contracts entered into by users in Montana.  It would be required to do so through a technical process called "geofencing."  This process would involve creating a virtual geographic boundary, or geofence, around the State of Montana.  Again, this process would be technically challenging, time-consuming, and expensive.

32.     While geofencing might block newcomers from trading on the platform from Montana, geographical cessation presents a host of additional difficulties for existing Kalshi users.  As of April 13, 2026, there are nearly 21,000 verified users

11

on Kalshi that have registered with a Montana address.  While the precise numbers are not public, these accounts have millions of dollars' worth of open positions on Kalshi markets that have not yet been settled.

33.    To cease offering event contracts in Montana would require Kalshi to "void" these existing positions.  But doing so would present intractable technical difficulties.

34.    To cease operations in the state, Kalshi would have to unilaterally void and refund all trades that originated in Montana; compliance would either be impossible or irreparably harmful.  To explain why, it is helpful to describe Kalshi's operation as an exchange as opposed to, for example, a sportsbook.  A sportsbook operates by taking bets from gamblers on games where the house has a statistical advantage.  In other words, gamblers bet against the "house," and when the house loses, it must pay the gambler.  Sportsbooks therefore maintain a high level of liquidity so that they can pay out those bets.  Sportsbooks set the prices at which their customers can transact, building in a margin (a "vig") to keep the odds stacked in their favor.  Sportsbooks ban successful bettors, or sharply limit the amount that they can wager.  And sportsbooks control whether bettors can "cash out" their trades (at prices worse than prevailing betting lines would imply).

35.    But Kalshi does not operate in this way.  Instead, it manages a federally regulated contract market and facilitates trades between different users on the

platform. Kalshi does not set odds, but instead lets users trade at prevailing market prices. Traders do not bet against the house, but rather enter into contracts with other traders on an exchange. Kalshi has no interest in whether any given trade is successful or not; it charges a fee for each trade, which is set by a publicly disclosed formula. It does not ban or limit successful traders. It allows traders to exit their position (at the prevailing market price) at any time before a contract settles, including by placing limit orders.

36.     As a designated contract market, Kalshi has the authority to cancel trades when necessary to mitigate market-disrupting events caused by malfunctions on its platform or errors in orders submitted by traders. However, due to the fully collateralized and short-term nature of trading on Kalshi, the circumstances in which this authority may be exercised are limited, and there is generally no cancellation or adjustment of an erroneous trade except in extraordinary circumstances.

37.     A closing of open positions at this magnitude could cause Kalshi to suffer staggering financial harm, not to mention the financial harm to its users, because Kalshi may be unable to compensate all of its Montana traders for the cancelled trades. Pursuant to the CEA, Kalshi operates through federally regulated clearinghouses that collateralize open positions. 7 U.S.C. § 7a-1. But Kalshi is fully collateralized with the understanding that every event contract between two users

will pay out $1 in total, and there are situations in which users' buying and selling of contracts causes the value of a given contract to exceed $1.

38.    If Kalshi were required to close all open positions held by Montana residents on event contracts, as an exchange, it would need to declare a market emergency and restore all the involved users to their original position. But there is a significant risk that Kalshi will be unable to restore all Montana residents who have entered into event contracts to their original position.

39.    The following example is illustrative. USER A buys a contract from USER B. USER A pays 90 cents, and USER B pays 10 cents. Then the contract changes in value. USER B sells his side to USER C, and USER C pays 90 cents for it. USER B cashes out his 80-cent profit. There is currently $1 in collateral in the clearinghouse (which will satisfy the ultimate $1 obligation to USER A or USER C at the conclusion of the contract period), but closing the open positions to their original value would mean that Kalshi owes USER A and USER C 90 cents each, or $1.80 total.

40.    Because Kalshi is fully collateralized up to $1 per contract, and any given contract may exceed $1 in value as the market's prediction on an event fluctuates before the event occurs (as illustrated in the preceding paragraph), Kalshi would be financially liable for any excess value above $1—in the example above, 80 cents per contract. However, Kalshi may lack sufficient funds to cover that

14

difference in value, which could be substantial.  As such, Kalshi would be forced to take on a significant (and unrecoverable) financial liability, and the forced exit of the positions (some of which would be more valuable at present than the opening price they would be cashed out at, causing a loss to traders) would severely damage Kalshi's reputation among users as a trustworthy and secure exchange, and could also lead to significant litigation claims.

41.    Kalshi, moreover, would want to give its users reasonable notice to allow them to exit their positions voluntarily if they so choose.  But the immediate threat of criminal liability from Montana state authorities raises serious questions about whether Kalshi could even engage in that basic diligence.

### II.    Irreparable Harms to Kalshi's Users

42.    Ceasing operations and voiding event contracts in Montana would impose irreparable harm on Kalshi's existing user base.

#### a.    Voiding Contracts

43.    Voiding Montana-based contracts on Kalshi would subject users to irreparable harm.  This would require Kalshi to refund the original cost of their existing positions on their respective open contracts.  Unilaterally settling traders' positions based on the original cost of the positions could lead to significant losses for users.  A trader who bought a contract during a market dip and is forced to exit

at the original contract price would not be able to realize any gains that he earned over his holding period for the contract.

44. By the same token, immediately voiding Montana-based users' contracts would disrupt the market for out-of-state users by causing a false signal in the market. Event contract markets respond to market fluctuations. For Kalshi to remove its contracts from the state, it would need to void existing transactions, which would require Kalshi to liquidate the entire market for both Montana and non-Montana users by settling prices at the original contract price. This would be prohibitively expensive and likely occasion the end of our federally regulated company simply to stave off potential criminal liability.

45. Voiding positions would also cause a massive disruption to users' investment-based expectations. Financial traders on Kalshi have taken positions based on their expectations for future events, and, like investors in other markets, expect to be able to alter their investments as facts on the ground change. Due to the unique market sensitivity of event contracts and the ease with which exchanges allow traders to place positions, traders capitalize on the opportunity to enter and exit their positions during the pendency of the contract. Traders also deploy well-recognized strategies like limit orders and portfolio-wide loss mitigation strategies. Investors may invest in a contract expecting to sell if the contract price falls below a certain value or expecting to reinvest more if the investment proves especially

16

sound.  And while some contracts operate on short timelines, many of the contracts that Kalshi offers are long-term.  For example, one of Kalshi's event contracts allows traders to place positions on whether the electric vehicle market share will rise above 30% by 2030.  Traders who have placed a position on this contract may be mitigating their risk on other investments by placing a position that effectively balances out the investment portfolio.  As the market for electric vehicles changes, so does the price of the event contract.  A trader may make an investment at 45 cents on the electric vehicle contract and institute a limit order to sell the contract when the price dips below 30 cents because 30 cents is the break-even point on the investment.

46.    Traders are constantly engaged in the practice of ascertaining risk.  As facts on the ground change, so do traders' strategies.  Indeed, traders often do not place a position on a contract with the intent of seeing that contract through to its expiration date and risking the full amount of the entry price.  Instead, they monitor market fluctuations during the lifetime of the event contract to determine when to cash out.  In other words, traders do not necessarily value event contracts based on the ultimate value of the contract at its expiration date. They also value the flexibility that event contracts provide as a financial tool to mitigate risk in real time.  But immediately voiding all contracts would upend that expectation.

47.    Voiding all Montana-based trades would completely upend this investment strategy and destroy traders' expectations.  If Kalshi were to void all

17

trades in Montana, traders would no longer be able to take action on their existing contracts in accordance with their investment models.  The flexible investment opportunity on which Kalshi users relied when entering into these contracts would be lost, and they may be forced to incur a loss even if their ultimate evaluation of the event was correct.  A Kalshi user that entered into a contract on "Will the Fed have an emergency meeting in 2026," for example, would not be able to exit that contract even if facts on the ground change dramatically in the meantime.  This is an economics-based event contract that is currently offered through the Kalshi exchange, and as of the date of this submission, values the odds of an emergency meeting at roughly 25%.[2]  But if trades are voided and a meeting does occur, trades with a "yes" position will have been cashed out at a level significantly below the ultimate value of the contract.

48.    Voiding all Montana-based trades also would not solely affect Montana-based users and transactions; it would wreak havoc on the entire Kalshi exchange ecosystem.  Again, exchanges do not operate like sportsbooks where gamblers bet against the house.  Instead, exchanges facilitate contracts between individual traders on the market.  Traders on either side of a contract are often from different states, given that Kalshi does not distinguish between the geographic

---

[2]  KalshiEX, *Will the Fed have an emergency meeting in 2026?*, https://kalshi.com/markets/kxfedmeet/fed-emergency-meeting/kxfedmeet-27.

location of traders.  If traders in Montana have their positions voided, then their trading counterparts in other states will likewise be limited in whether and how often they can enter and exit their positions on the Kalshi exchange.  Traders in California, for example, may expect to rely on traders in Montana on contracts related to water availability in the American Southwest.  But if the Montana-based traders and transactions are all of a sudden restricted on the platform, that will have an equal and opposite effect on the market for traders in other states.  Pausing transactions in Montana would thus disrupt users' positions on the exchange nationwide, which they placed in reliance on their ability to flexibly enter and exit.  This could wreak havoc on hundreds of millions of dollars in open interest currently on the exchange from open transactions.

b.    Refunding Balances on Kalshi

49.    Refunding all user deposits on Kalshi would also harm users, who can earn 3.25% APY interest on deposited funds and open positions on the exchange, and would lose the ability to earn that interest.[3]

c.    Pausing Positions

50.    Defendants would require Kalshi to cease offering event contracts and void all pending event contracts, but even less extreme measures would harm Kalshi.

---

[3] https://help.kalshi.com/navigating-the-exchange/your-portfolio/apy-on-kalshi.

Rather than voiding all contracts, other states have demanded that Kalshi pause trading within their states.  But even pausing current Montana-based positions on Kalshi prior to pending the outcome of the event at issue would cause irreparable harm by denying traders access to their property and threatening their economic expectations.

### III. Harms to Kalshi Resulting from the Risk of CFTC Decertification

51.    Ceasing to offer event contracts in Montana would jeopardize Kalshi's status as a CFTC-designated contract market.  It is difficult to overstate how harmful this would be to Kalshi.

52.    As the Head of Markets at Kalshi, I oversee the entire regulatory review process for Kalshi's contract markets.  In that role, I am responsible for ensuring that each of Kalshi's contracts complies with the nearly two dozen CFTC Core Principles that govern event contracts traded on CFTC-regulated exchanges.  Complying with Defendants' demands could be understood to put Kalshi out of compliance with these Core Principles, imperiling Kalshi's designation as a contract market under the CFTC's purview.

53.    CFTC Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process."  17 C.F.R. § 38.250.  Immediately liquidating or pausing traders' positions could be understood to lead to the very sort of price

20

distortion and market manipulation that the CFTC regulations guard against. Pausing trades could cause "disruption[] of the delivery or cash-settlement process" and immediate liquidation could cause "price distortion."

54.    CFTC Core Principle 2 requires that designated contract markets provide their "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services."  17 C.F.R. § 38.151(b). Pursuant to this regulation, "[a]ccess criteria" must be "impartial, transparent, and applied in a non-discriminatory manner."  *Id.*  Discrimination based on geographic location would conflict with this requirement, but that is exactly what Kalshi would have to do to comply with the Defendants' demands.  Traders who execute positions in Montana would be barred from accessing Kalshi's exchange and placing positions on Kalshi's contracts, whereas traders in any other state would have unlimited access to the platform.

55.    Violation of these Core Principles could subject Kalshi to the panoply of enforcement mechanisms that the CFTC has at its disposal.  Those tools range from civil monetary penalties to restitution to criminal liability.

56.    Violating these principles could even jeopardize Kalshi's federal-contract-market status with the CFTC.  The CFTC is authorized to suspend or revoke Kalshi's designation if Kalshi fails to comply with federal regulations.  Kalshi has spent the better part of the last decade working to gain federal registration as a

contract market under the CFTC and has scrupulously endeavored to comply with CFTC regulations to maintain that registration.  Losing our federal license would be catastrophic for the company, even if Kalshi were to ultimately succeed in this suit against the state authorities in the long term.

57.    CFTC enforcement is not a mere theoretical risk.  Several years ago, a CFTC-regulated exchange was charged with offering contracts on a discriminatory basis because it only allowed sportsbooks to trade on its platform.  Discriminating on the basis of state residence could likewise subject Kalshi to federal repercussions. It is inconceivable, for example, to imagine a CFTC-designated contract market like the Chicago Mercantile Exchange abruptly closing its exchange to users in a particular state without serious federal repercussions.  Yet that is what compliance with Montana anti-gambling laws as interpreted by Defendants would require of Kalshi.

58.    The CFTC reaffirmed this view in a recent amicus brief in the Ninth Circuit.  The CFTC stated that DCMs are "required" to "provide 'impartial access' to all eligible participants nationwide,"—a mandate impossible to fulfill "[i]f a state ban[s Kalshi's] contracts." *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187, ECF No. 38-2 (9th Cir.).

59.     Compliance with Montana law thus places Kalshi in a regulatory Catch-22:  Either it complies with Montana law and risks CFTC sanctions, or it continues operations in Montana and subjects itself to state criminal liability.

### IV.     Economic and Reputational Harms to Kalshi

60.     Compliance with the cease-and-desist would also cause economic and reputational harm to Kalshi.  Losses on both fronts would be irreparable even if Kalshi ultimately wins this case.

61.     Kalshi has nearly 21,000 verified users in Montana with millions of dollars invested on the exchange.  The market uncertainty created by abruptly closing its contracts in Montana could lead many users to leave the platform—even users outside of Montana.  Traders must have confidence in the integrity of the market to invest in it, but market confidence would be deeply shaken by complying with Montana's demand and the prospect other states may follow suit.  Even if Kalshi were to prevail in this lawsuit, regaining that market confidence would be difficult.  Kalshi has expended enormous resources to advertise its platform, onboard traders, and maintain their business.  Losing those traders—who Montana would have Kalshi expel from the platform by not only voiding their trades but refunding any money deposited with Kalshi—would mean that many of those efforts were for naught.  Thus, compliance would impose significant and irrevocable economic harm on the company.

62. The threat of state litigation also endangers Kalshi's established partnerships and relationships. One of Kalshi's banner partners, Robinhood, has already chosen not to list Kalshi's event contracts in some states because of state cease-and-desist letters that make similar demands to Montana's threatened enforcement here. This is a massive disruption for Kalshi given Robinhood had agreed to list Kalshi's contracts to its millions of active users, but chose to deviate from that plan in direct response to demands similar to the ones Montana issued here. Other partners that help us comply with CFTC regulations by facilitating our digital investment platform and helping detect improper trading behavior may also seek to limit their exposure given the uncertainty of the application of state law to Kalshi.

63. The effects of Montana's threats are not limited to the state but instead threaten to open a Pandora's box of regulation for the 49 other states that may wish to impose their local laws on Kalshi's exchange. In the absence of a preliminary injunction, partners and users alike will be hesitant to engage with Kalshi given this potential for state litigation.

\* \* \*

64. Statements suggesting imminent enforcement of Montana law impose irreparable harms that Kalshi cannot avoid. If Kalshi does not comply with Montana's demands, the company faces criminal liability. But if Kalshi attempts to comply with Montana's demands, it would incur massive costs, its users would be

24

harmed, its federal registration would be imperiled, and user confidence in the integrity of its market would be shaken. All of these harms are compounded by the real risk that other states will be emboldened to follow Montana's lead and Kalshi will have the possibility of being subjected to multiple, inconsistent regulatory schemes. And there are serious questions about whether Kalshi could implement the technical solutions on an expedited timeline. Kalshi has spent years cultivating its reputation and developing its user base. Compliance with Montana's demands would lead to economic and reputational harm that will be difficult to regain.

65.     Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

At New York, New York, this 21st day of April, 2026.

Xavier Sottile

25